**In re Gilbert G. BEEZLEY, Debtor.**

**Gilbert G. BEEZLEY, Appellant,**

v.

**CALIFORNIA LAND TITLE COMPANY, Appellee.**

**No. 91–55809.**

United States Court of Appeals, Ninth Circuit.

Submitted Oct. 6, 1992.*

Decided June 4, 1993.

Gilbert G. Beezley, pro se.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a), Ninth Circuit Rule 34–4.

Mark E. Rohatiner, Ellen L. Frank, Schneider, Goldberg, Rohatiner & Yuen, Beverly Hills, CA, for appellee.

Before O'SCANNLAIN and RYMER, Circuit Judges, and ZILLY,** District Judge.

PER CURIAM:

Debtor Gilbert G. Beezley appeals the decision of the Ninth Circuit BAP, affirming the bankruptcy court's denial of his motion to reopen his bankruptcy case under 11 U.S.C. § 350(b). We have jurisdiction pursuant to 28 U.S.C. § 158(d), and we affirm.

Beezley argues that the bankruptcy court abused its discretion by failing to grant his motion to reopen his case. See In re Herzig, 96 B.R. 264, 266 (9th Cir. BAP 1989) (bankruptcy court's refusal to reopen a closed case under 11 U.S.C. § 350(b) reviewed for an abuse of discretion). We disagree. Based on the assumption that amendment was necessary to discharge the debt, Beezley sought to add an omitted debt to his schedules. Beezley's, however, was a no asset, no bar date Chapter 7 case. After such a case has been closed, dischargeability is unaffected by scheduling; amendment of Beezley's schedules would thus have been a pointless exercise. See American Standard Ins. Co. v. Bakehorn, 147 B.R. 480, 483 (N.D.Ind.1992); In re Stecklow, 144 B.R. 314, 317 (Bankr.D.Md.1992); In re Tucker, 143 B.R. 330, 334 (Bankr.W.D.N.Y.1992); In re Peacock, 139 B.R. 421, 422 (Bankr.E.D.Mich. 1992); In re Thibodeau, 136 B.R. 7, 10 (Bankr.D.Mass.1992); In re Hunter, 116 B.R. 3, 5 (Bankr.D.D.C.1990); In re Mendiola, 99 B.R. 864, 865 (Bankr.N.D.Ill.1989). If the omitted debt is of a type covered by 11 U.S.C. § 523(a)(3)(A), it has already been discharged pursuant to 11 U.S.C. § 727. If the debt is of a type covered by 11 U.S.C. § 523(a)(3)(B), it has not been discharged, and is non-dischargeable.[1] In sum, reopen-

ing here in order to grant Beezley's request would not have "accord[ed] relief to" Beezley; thus, there was no abuse of discretion.

AFFIRMED.

O'SCANNLAIN, Circuit Judge, concurring:

The simple question with which we are presented—whether the bankruptcy court abused its discretion by denying the debtor's motion to reopen—requires, in my view, more than a simple answer. I write separately to address certain matters that the per curiam opinion does not discuss, but which are squarely presented on the record before us and implicate important principles of bankruptcy law.

I

Beezley filed for bankruptcy under Chapter 7 on June 10, 1987. Because he had no assets available for distribution to his creditors in bankruptcy, no bar date was set by the court establishing a deadline for creditors to file proofs of claim.

Three years earlier, California Land Title Co. ("Cal Land") had obtained a default judgment against Beezley in California state court arising out of a 1979 transaction in which Beezley was the seller and Cal Land the title insurer of certain real property. Beezley made no mention of Cal Land's claim or of its judgment against him in any of his schedules. Consequently, Cal Land did not receive notice of Beezley's bankruptcy. Beezley received his discharge on November 6, 1987, and his case was thereafter closed.

In January 1990, Beezley moved to reopen his bankruptcy case for the purpose of amending his schedules to add the omitted debt to Cal Land. Cal Land filed a memorandum with the bankruptcy court in opposition to Beezley's motion to reopen, advising the court that Cal Land would seek to establish that its claim was nondischargeable. The bankruptcy court held a hearing, at the conclusion of which it denied Beezley's motion, citing the case of In re Stark, 717 F.2d

---

** The Honorable Thomas S. Zilly, United States District Judge for the Western District of Washington, sitting by designation.

1. We express no opinion as to whether the omitted debt was or was not discharged.

322 (7th Cir.1983) (per curiam). The Bankruptcy Appellate Panel ("BAP") subsequently affirmed by memorandum, citing the same authority.

## II

The source of the bankruptcy court's power to reopen a closed case is section 350(b).[1] This section gives the court discretion to reopen a case "to administer assets, to accord relief to the debtor, or for other cause." The question posed by this appeal is whether the bankruptcy court abused that discretion in denying Beezley's motion to reopen. *See In re Herzig,* 96 B.R. 264, 266 (9th Cir. BAP 1989) (decision on motion to reopen reviewed for abuse of discretion). Answering this question is a complicated affair, and requires close attention to the difficult language of sections 523 and 727 of the Bankruptcy Code.

### A

Section 727(b) of the Bankruptcy Code states in part: "Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter [i.e., the date of the bankruptcy filing]...." "The operative word is 'all'. There is nothing in Section 727 about whether the debt is or is not scheduled. So far as that section is concerned, a pre-bankruptcy debt is discharged, whether or not it is scheduled." *In re Mendiola,* 99 B.R. 864, 865 (Bankr.N.D.Ill. 1989). *See In re Stecklow,* 144 B.R. 314, 317 (Bankr.D.Md.1992) ("breadth of the discharge" under § 727 is "comprehensive"); *In re Thibodeau,* 136 B.R. 7, 8 (Bankr.D.Mass. 1992) ("§ 727(b) itself makes no exception for unlisted debts"). Thus, unless section 523 dictates otherwise, every prepetition debt becomes discharged under section 727.

Section 523(a) provides in part:
(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
(3) neither listed nor scheduled ... in time to permit—

(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request[.]

Unscheduled debts are thus divided into two groups: those that are "of a kind specified in paragraph (2), (4), or (6) of this subsection," and those that are not. Loosely speaking, the paragraphs in question describe debts arising from intentional wrongdoing of various sorts (respectively, fraud, fiduciary misconduct, and the commission of malicious torts). What distinguishes these from all other debts is that, under section 523(c) and rule 4007(c), a creditor must file a complaint in the bankruptcy court within 60 days after the date established for the first meeting of creditors in order to assert their nondischargeability. Failure to litigate the dischargeability of these sorts of debts right away disables the creditor from ever doing so; an intentional tort debt will be discharged just like any other.

Section 523(a)(3) threatens nondischargeability in order to safeguard the rights of creditors in the bankruptcy process. The difference between subparagraphs (A) and (B) reflects the different rights enjoyed by and requirements imposed upon different kinds of creditors. For most creditors, the fundamental right enjoyed in bankruptcy is to file a claim, since this is the sine qua non of participating in any distribution of the estate's assets. Section 523(a)(3)(A) safeguards this right by excepting from discharge debts owed to creditors who did not know about the case in time to file a claim. By contrast, for creditors holding intentional tort claims the salient rights are not only to

---

1. All references are to the Bankruptcy Code, Title 11, United States Code.

file a claim but also to secure an adjudication of nondischargeability. Thus, section 523(a)(3)(B) excepts intentional tort debts from discharge notwithstanding the creditor's failure to file a timely complaint under section 523(c) if the creditor did not know about the case in time to file such a complaint (even if it was able to file a timely proof of claim).

With this in mind, the convoluted language of section 523(a)(3) can be paraphrased as follows:

    (a) A discharge does not cover—

        (3) an unscheduled debt if—

            (A) with respect to a debt not covered by § 523(c), the failure to schedule deprives the creditor of the opportunity to file a timely claim, or

            (B) with respect to an intentional tort debt covered by § 523(c), the failure to schedule deprives the creditor of the opportunity to file a timely claim *or* a nondischargeability complaint.

### B

In applying section 523(a)(3) to the case before us, it is preferable to begin with subsection (A).

As noted, the entire thrust of subparagraph (A) is to protect the creditor's right to file a proof of claim, and so to participate in any distribution of the assets of the estate. However, "[i]n a case without assets to distribute the right to file a proof of claim is meaningless and worthless." *Mendiola,* 99 B.R. at 867. The bankruptcy rules therefore permit the court to dispense with the filing of proofs of claim in a no-asset case.

> In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims.

Bankr.Rule 2002(e).

When a no-dividend notice under Rule 2002(e) is sent out, an exception is made to the basic rule requiring proofs of claim to be filed within 90 days after the date established for the first meeting of creditors. Under this exception, creditors need not file a proof of claim unless and until the clerk sends notice that non-exempt assets have been located which may permit a dividend to be paid. Bankr.Rule 3002(c)(5). In practice, "[t]he exception has now subsumed the rule, so that in most cases there is no time limit (bar date) set by the Clerk's office for creditors to file their proofs of claim." *In re Corgiat,* 123 B.R. 388, 389 (Bankr.E.D.Cal. 1991). *See In re Tucker,* 143 B.R. 330, 332 (Bankr.W.D.N.Y.1992).

The critical point here is that in most cases filed under Chapter 7 (i.e., no asset, no bar date cases), "the date to file claims is never set and thus § 523(a)(3)(A) is not triggered." *In re Walendy,* 118 B.R. 774, 775 (Bankr. C.D.Cal.1990). That is, in a no asset, no bar date case, section 523(a)(3)(A) is not implicated "because there can never be a time when it is too late 'to permit timely filing of a proof of claim.'" *Mendiola,* 99 B.R. at 867. *See In re Tyler,* 139 B.R. 733, 735 (D.Colo.1992); *In re Peacock,* 139 B.R. 421, 424 (Bankr. E.D.Mich.1992); *Walendy,* 118 B.R. at 776.

"Thus, in the typical no asset Chapter 7 case, where the *no dividend statement of* [rule] 2002(e) is utilized by the clerk and no claims bar date set, the prepetition dischargeable claim of an omitted creditor, being otherwise unaffected by § 523, remains discharged. In other words, in the typical Chapter 7 case, the debtor's failure to list a creditor does not, in and of itself, make the creditor's claim nondischargeable." *Corgiat,* 123 B.R. at 391. Stated differently, where section 523 does not except a prepetition debt from discharge, the debt remains within the scope of the discharge afforded by section 727. Scheduling, per se, is irrelevant. *See Mendiola,* 99 B.R. at 867 ("since Section 523(a)(3)(A) does not apply, the debts the Debtor seeks to add to the schedules are already discharged, even though they were not listed or scheduled"); *accord American Standard Ins. Co. v. Bakehorn,* 147 B.R. 480, 487 (N.D.Ind.1992); *Tyler,* 139 B.R. at 735; *Stecklow,* 144 B.R. at 315; *Tucker,* 143 B.R. at 334; *Peacock,* 139 B.R. at 424; *Thibodeau,*

136 B.R. at 8. Since dischargeability is unaffected by scheduling in a no asset, no bar date case, "reopening the case merely to schedule the debt is for all practical purposes a useless gesture." *In re Hunter*, 116 B.R. 3, 5 (Bankr.D.D.C.1990); *accord American Standard*, 147 B.R. at 483 (of "no legal effect"); *Stecklow*, 144 B.R. at 317 ("futile"); *Tucker*, 143 B.R. at 334 ("unnecessary" and "unwarranted"); *Peacock*, 139 B.R. at 422 ("pointless"); *Thibodeau*, 136 B.R. at 10 ("meaningless").

Similarly, even if an omitted debt falls under section 523(a)(3)(B), no purpose is served by reopening solely in order to amend the schedules; scheduling, per se, is irrelevant to dischargeability even under this subparagraph once a case is closed. As noted above, section 523(a)(3)(B) provides that, if the debt flows from an intentional tort "of a kind specified" in the relevant paragraphs, the debtor's failure to schedule in time to provide notice to the creditor of the need to seek an adjudication of dischargeability is *conclusive* (at least in the absence of actual knowledge of the bankruptcy on the part of the creditor). The debt is not discharged. "Scheduling makes no difference to outcome. 'Reopening a case does not extend the time to file complaints to determine dischargeability. Either the creditor had actual, timely notice of the [case] or he didn't. Amending the schedules will not change that.'" *Mendiola*, 99 B.R. at 868 (quoting *In re Karamitsos*, 88 B.R. 122, 123 (Bankr.S.D.Tex.1988)); *accord American Standard*, 147 B.R. at 484; *Thibodeau*, 136 B.R. at 10.

### III

Beezley moved to reopen his bankruptcy case in order to add the omitted debt to Cal Land to his schedules, apparently in the mistaken belief that by amending his schedules he would discharge the debt. Cal Land, upon receiving notice of Beezley's motion, vigorously opposed it, also, apparently, under the mistaken impression that the listing of the previously omitted debt would accomplish its discharge. As the analysis set forth above shows, however, because Beezley's was a no-asset, no-bar-date Chapter 7 proceeding, the amendment of Beezley's schedules, in and of itself, could not possibly have had any effect on the status of his obligation to Cal Land. Either the debt was long ago discharged by the operation of sections 523 and 727 or it was not.

Beezley's request for leave to amend his schedules was therefore a request for that which is legally irrelevant. The bankruptcy court was surely not required to involve itself in such a pointless exercise. The court thus could, without abuse of discretion, have simply rejected Beezley's motion out of hand. *See Mendiola*, 99 B.R. at 867.

Were this what the bankruptcy court did in fact, I would feel no need to add to what is said in our per curiam opinion. But it did not do so, and the substance of the bankruptcy court's actual ruling (and the BAP's affirmance) reveals, I submit, a misconception that we should not allow to pass uncorrected.

The bankruptcy court denied Beezley's motion only after it concluded that the omission of Cal Land from Beezley's schedules was not inadvertent, but was the result of an "intentional design" on Beezley's part. The court reached this conclusion based on the evidence provided by a letter that Beezley had written in 1983 and sent to the state court in which Cal Land's suit against him was then pending. The letter, signed by Beezley, is addressed "To Whom it May Concern," and bears the caption, "Re: Ventura County Superior Court Filing No. 74389, Cal Land Title v. G. Beezley or Air Trans Systems."

The bankruptcy court observed that "the existence of the lawsuit and your reference to the lawsuit [in the letter] evidences your knowledge that [Cal Land] want[ed] money from you. It's clear that you knew they had a claim against you." It was this that persuaded the court that the case should not be reopened. "There is other authority from other circuits that states that amending—reopening this case—reopening the case to amend the schedules to add omitted creditors is appropriate where there is no evidence of fraud or intentional design behind the omission. And that's *In Re: Stark* out of the 7th Circuit. It's a circuit level case."

Whatever else might be said, it is incontrovertible that the bankruptcy court did not rely on the reasoning that underlies the per curiam opinion in concluding that Beezley's motion should be denied. Rather, both the bankruptcy court in denying the motion, and the BAP in affirming the denial, treated the rule in *Stark* as authoritative. Why did the bankruptcy court not simply reject Beezley's motion out of hand as a pointless waste of time? Why did the court feel the need to rely upon authority from another circuit to decide Beezley's motion?

The answer, I believe, is that the bankruptcy court thought it was adjudicating the dischargeability of Beezley's debt when it denied his motion to reopen and amend his schedules. That is, the bankruptcy court, just like Beezley and Cal Land, proceeded here on the basis of the erroneous assumption that it would be necessary (and sufficient) for Beezley to reopen the case and add Cal Land to his schedules in order to discharge the omitted debt.

This is apparent from examining *In re Stark* itself. In June 1980, the Starks incurred certain hospital bills. In August 1980, they filed a bankruptcy petition. No bar date was set, and no assets distributed. Because the Starks believed that the hospital bills would be paid by their insurance company, they did not include the hospital in their schedule of creditors. The Starks received their discharge in November 1980. As it happened, however, the hospital bills were not paid by the insurance company. The hospital obtained a judgment against the Starks in November 1981. The Starks then moved to reopen their bankruptcy case to amend their schedule of creditors to include the hospital. The Seventh Circuit ruled that they should be permitted to do so.

As explained above, there was no need whatsoever to "permit" the Starks to amend their schedules. Since theirs was a no-asset, no-bar-date case, the Stark's debt to the hospital was discharged by the operation of section 727 along with all their other prepetition debts in November 1980. The Seventh Circuit panel that decided the case failed to recognize this. Indeed, the panel believed that if section 523 were literally applied, the Starks' debt would have been excepted from discharge. In this respect, the panel stated that it agreed with the district court that "section 523(a) should not be mechanically applied to deprive a debtor of a discharge in a no asset case...." *Id.* at 323.

Thus the *Stark* panel believed that it had to "exercise its equitable powers" in order to allow the debtors to discharge their omitted debt. *Id.* Further the panel believed that exercising those powers to permit the debtors to amend their schedules would achieve the desired end. This explains the holding in the case: "In a no-asset bankruptcy where notice has been given [that no bar date will be set], a debtor may reopen the estate to add an omitted creditor where there is no evidence of fraud or intentional design." *Id.* at 324.

The analysis presented above clearly demonstrates that *Stark* misstates the law. *Stark* treats the question whether to reopen a closed no-asset, no-bar-date case to amend the schedule of creditors as equivalent to the question whether to permit discharge of the omitted debt.[2] But, again, scheduling, per se, is irrelevant. The legal standard articulated in *Stark* is simply incorrect, and I

---

**2.** That the *Stark* case proceeds on this erroneous premise has been repeatedly recognized in the bankruptcy courts. *See In re Peacock,* 139 B.R. 421, 426 & n. 9 (Bankr.E.D.Mich.1992) (warning against "misplaced reliance on confusing comments in *Stark* ": "[T]he train began to run off the track when the lawyers in *Stark* misperceived the issue. The Seventh Circuit failed to put the train back on the track in time to prevent the analytical chaos which has ensued."); *In re Thibodeau,* 136 B.R. 7, 10 (Bankr.D.Mass.1992) (*Stark* "is based upon the unexamined assumption ... that in a no-asset case where no claim filing deadline has been fixed, a debt must be listed in order to be discharged"); *In re Guzman,* 130 B.R. 489, 491 n. 4 (Bankr.W.D.Tex.1991)

(*Stark* "erroneously assumed that, unless the case were re-opened as the debtor requested, the creditor's claim would not be discharged"); *In re Musgraves,* 129 B.R. 119, 121 n. 6 (Bankr. W.D.Tex.1991) (same); *In re Bulbin,* 122 B.R. 161, 161 (Bankr.D.D.C.1990) (refusing to follow "dicta in [*Stark* ] which assumed for purposes of decision and without discussion that listing of an omitted creditor was necessary to make the omitted creditor's claim dischargeable"); *In re Hunter,* 116 B.R. 3, 5 (Bankr.D.D.C.1990) (same); *In re Crull,* 101 B.R. 60, 61 (Bankr.W.D.Ark.1989) (*Stark* "incorrectly assume[d] that if a case is reopened and an omitted creditor's claim is listed by amendment, the discharge automatically

would disapprove reliance on it in the bankruptcy courts of this circuit.

## IV

The damage done by an incautious reliance on *Stark* is far from trivial. By applying *Stark*, both the bankruptcy court and the BAP effectively held that Beezley was not entitled to litigate the question whether his debt to Cal Land had been discharged by the operation of sections 523 and 727 unless his omission of Cal Land from his schedules was in good faith. Such a holding interposes an equitable barrier between the debtor and his discharge that Congress simply did not enact

and retroactively applies"); *In re Mendiola*, 99 B.R. 864, 868 (Bankr.N.D.Ill.1989) ("it is clear from the opinion in *Stark* that the Court assumed that the purpose that would be served by the reopening and addition of the omitted creditor was the discharge of that creditor's claim"); *In re Anderson*, 72 B.R. 495, 496 (Bankr.D.Minn. 1987) (*Stark* is "based on false premises regarding the nature and effect of a discharge").

3. There need be no concern that applying section 523(a)(3) according to its terms will encourage debtors to ignore their obligation to list all claims in their schedules. A debtor must declare under penalty of perjury that the statements made in his schedules are true and correct. A debtor who knowingly and fraudulently omits a creditor thus risks global denial or revocation of his discharge—that is, the withholding of *all* bankruptcy relief—under section 727 of the Bankruptcy Code. *See* 11 U.S.C. §§ 727(a)(4)(A), 727(d)(1). In addition, knowing and fraudulent misstatements in connection with a bankruptcy proceeding may be penalized by up to five years in prison and a $5,000 fine. *See* 18 U.S.C. § 152.

4. That this was a *deliberate* congressional choice is plain from the legislative history of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549. The Senate Report notes that the new section 523(a)(3) "follows current law, but clarifies some uncertainties generated by the case law construing 17a(3) [of the old Bankruptcy Act]." S.Rep. No. 95–989, 95th Cong., 2d Sess. 78–79, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5864. The formal statements of both the House and Senate leaders responsible for the final shape of the new Bankruptcy Code leave no doubt as to which "uncertainties" were intended to be clarified: "Section 523(a)(3) ... is intended to overrule *Birkett v. Columbia Bank*, 195 U.S. 345, 25 S.Ct. 38, 49 L.Ed. 231 (1904)." 124 Cong.Rec. H11089 (Sept. 28, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6522 (statement of Rep. Edwards); 124 Cong.Rec. S17406 (Oct. 6, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6522 (statement of Sen. DeConcini).

in the Bankruptcy Code. Nowhere in section 523(a)(3) is the *reason* why a debt was omitted from the bankruptcy schedules made relevant to the discharge of that debt.[3] Courts are not free to condition the relief Congress has made available in the Bankruptcy Code on factors Congress has deliberately excluded from consideration.[4]

It cannot be overemphasized that we deal here with matters that are absolutely fundamental to the integrity of the Bankruptcy Code: the balance struck between the rights of creditors on the one hand, and the policy of affording the debtor a fresh start on the other. How to strike that balance is an

In *Birkett*, the Supreme Court construed the predecessor of section 523(a)(3), which excepted from discharge any debt "not ... duly scheduled in time for proof and allowance, ... unless [the] creditor had notice or actual knowledge of the proceedings in bankruptcy." The Court stated that:

Actual knowledge of the proceedings contemplated by the section is a knowledge in time to avail a creditor of the benefits of the law—in time to give him an equal opportunity with other creditors—*not a knowledge that may come so late as to deprive him of participation in the administration of the affairs of the estate* or to deprive him of dividends.... That the law should give a creditor remedies against the estate of a bankrupt, notwithstanding the neglect or default of the bankrupt, is natural. The law would, indeed, be defective without them. *It would also be defective if it permitted the bankrupt to experiment with it—to so manage and use its provisions as to conceal his estate, deceive or keep his creditors in ignorance of his proceeding without penalty to him.*

195 U.S. at 350, 25 S.Ct. at 39 (emphasis added). The legislative history of section 523(a)(3) declares unambiguously that *Birkett* was intended to be overruled. Assuming that we require such an explicit directive before we will be moved to heed the clear command of the Bankruptcy Code itself, I see no way to avoid the force of this one. Congress has expressly disapproved the importation of equitable notions of a debtor's good faith or a creditor's fair opportunity to participate in the bankruptcy process into the interpretation and analysis of section 523(a)(3). *See Mendiola*, 99 B.R. at 869–70 ("[T]he clear language of Section 523(a) is not an aberration, but represents a Congressional policy choice. Congress could have excepted from the debtor's discharge debts that were omitted, intentionally or otherwise, from the schedules. Congress might simply have continued pre-Code law.... Instead, the legislative history shows that Congress expressly overruled that prior law and created the narrow exception found in § 523(a)(3)....").

inordinately difficult question—a question of public policy—as to which reasonable minds may and quite frequently do differ. Our task is, perhaps, a relatively easier one, for we have only to apply the law as Congress has written it. What Congress deemed a proper balancing of the equities as between debtor and creditor with respect to unlisted debts it has enacted in section 523(a)(3) of the Bankruptcy Code. It is not for the courts to restrike that balance according to their own lights.

Yet this, albeit inadvertently, is what the panel in *Stark* did. *Stark* stated that a debtor must prove his good faith before the discharge of an omitted debt will be recognized.

There, this rule passed unnoticed as a sort of boilerplate—the Starks' good faith was never in question. As applied by the bankruptcy court in the circumstances of this case, however, this rule operated to supplant the analysis mandated by section 523, and to substitute in its stead a test involving equitable considerations wholly foreign to that section. *See Peacock*, 139 B.R. at 427 ("whether or not the debtor was reckless in omitting [the] claim is of no moment" with respect to the discharge of the omitted debt). The result is fundamental error affecting significant rights under the Bankruptcy Code.[5]

The analysis the Code requires is, I submit, as follows: Because Beezley's was a no-

---

**5.** The equitable rule applied in *Stark* to a no-asset, no-bar-date case was originally developed for use in a very different kind of bankruptcy. The incautious use of such a standard outside the context in which it originated is at the heart of the problems we confront here.

The typical Chapter 7 bankruptcy is the no-asset, no-bar-date case. In some instances, however, the debtor has no assets to distribute to creditors, but a bar date *is* set by the clerk's office. *See In re Corgiat*, 123 B.R. 388, 390–91 (Bankr.E.D.Cal.1991) (recognizing the importance of this distinction); *In re Walendy*, 118 B.R. 774, 775–76 (Bankr.C.D.Cal.1990) (same). In such a case, section 523(a)(3)(A) operates with respect to an omitted creditor as follows: a deadline for filing claims is established; the omitted creditor receives no notice of the debtor's bankruptcy; the deadline for filing claims passes; the debtor's case is closed, with no assets having been distributed; the omitted creditor, technically, has been deprived of the right protected by section 523(a)(3)(A), i.e., the right to file a timely proof of claim; thus, by operation of the plain language of the Bankruptcy Code, the omitted debt would appear to be excepted from discharge.

Many courts, however, have felt that this is an inequitable result. After all, since no assets were distributed, the omitted creditor has suffered no real prejudice because of its inability to file a timely proof of claim. Such a creditor is in exactly the same situation as the creditors that did file. Allowing this creditor to retain its pre-bankruptcy claim against the debtor seems to amount to an undeserved windfall, for the creditor is left in a better position than all other creditors merely by virtue of having been left off the debtor's schedules.

These courts have thus recognized an equitable exception to the operation of section 523(a)(3). The exception, usually associated with the case of *Robinson v. Mann*, 339 F.2d 547 (5th Cir.1964), provides that in a no-asset bankruptcy where a bar date *was* set, a debtor may reopen the case to add an omitted creditor to its schedules *nunc pro*

*tunc* where there is no evidence of fraud or intentional design, or any material prejudice to the creditor. In this context, technically, it is indeed necessary to reopen the case and add the omitted creditor to the schedules, for only this permits the relation back *nunc pro tunc* of the scheduling. This procedure is obviously a legal fiction, but it provides a means of avoiding the results of a literal application of section 523(a)(3)(A), thus discharging the omitted debt and fostering the debtor's fresh start.

A comparison of *Stark* and *Robinson* shows that the rules they announce are, in fact, identical. Yet there is no need for such a rule in a no-asset, no-bar-date Chapter 7, hence no justification for its application. In the *Robinson*-type case, the debtor, in effect, asks the bankruptcy court to do him a favor, to intercede on his behalf so as to shield him from the operation of the plain language of the Code, and so permit the discharge of his omitted debt. It is entirely appropriate in this context to impose an equitable requirement of good faith on the debtor: if a court is to invoke its equity powers to do the debtor a favor it is not too much to ask that his hands be clean. In a no-asset, no-bar-date case like this one, however, the debtor needs no favors from the bankruptcy court, since his omitted debt will be discharged by the straightforward operation of section 523(a)(3). Applied here, what developed as an equitable condition precedent to the court's granting the debtor *additional* relief beyond that afforded by the Bankruptcy Code becomes an equitable *barrier* to the debtor's receiving the relief the Code itself expressly grants.

I express no opinion on the propriety of the equitable exception announced in *Robinson* as applied in its proper context. A debate is currently raging among the bankruptcy courts of this circuit regarding this very issue. *Compare In re Laczko*, 37 B.R. 676, 678–79 (9th Cir. BAP 1984) (rejecting *Robinson* and adopting "strict" view of § 523(a)(3)), *aff'd without op.*, 772 F.2d 912 (9th Cir.1985), *with In re Brosman*, 119 B.R. 212, 213–16 (Bankr.D.Alaska 1990) (refusing to

asset, no-bar-date case, section 523(a)(3)(A) does not bar the discharge of his debt to Cal Land under section 727(b). Cal Land has alleged, however, that Beezley committed fraud in connection with the transaction that was the subject of its lawsuit against him, and that the debt evidenced by the default judgment it obtained against Beezley is therefore nondischargeable under section 523(a)(3)(B). Had Beezley listed this debt in his bankruptcy schedules, Cal Land would have been required under Bankruptcy Rule 4007(c) to litigate this nondischargeability question "within 60 days following the first date set for the meeting of creditors," which had long since passed when this litigation commenced. However, because Beezley failed to schedule the debt, Bankruptcy Rule 4007(b) affords Cal Land the right to litigate dischargeability outside the normal time limits, again in accordance with section 523(a)(3)(B). *See American Standard*, 147 B.R. at 484 ("In effect, a debtor who fails to list a creditor loses the jurisdictional and time limit protections of Section 523(c) and Rule 4007(c)."). *See also In re Lochrie*, 78 B.R. 257, 259–60 (9th Cir. BAP 1987).

This is the only right Cal Land can claim by virtue of its omission from Beezley's schedules. In particular, Cal Land cannot escape the need to prove nondischargeability merely because Beezley's failure to list his debt to Cal Land may have been intentional or may have prejudiced its ability to show that Beezley committed fraud years ago, as the holding in *Stark* would suggest. *Stark* has no place in the analysis of the matter at hand.

### IV

Faced with Beezley's motion on the one hand, and Cal Land's opposition on the other, I believe the bankruptcy court could have construed the matter as a request under Bankruptcy Rule 4007(b) for a determination of dischargeability—for this, as the court it-

self recognized, was really what both parties wanted.[6] This, however, is now of little moment from the standpoint of the litigants. The important point is that whether Beezley's debt to Cal Land is in fact nondischargeable remains to be adjudicated.

In sum, *Stark* introduces a notion of "good faith" into the Bankruptcy Code's finely tuned system for determining the dischargeability of omitted debts. Because adequate and explicit means for determining dischargeability are provided in the Code itself, the bankruptcy courts of this circuit should place no reliance on *Stark*.

---

follow *Laczko* ). My point is simply that, whereas *Robinson* contravenes the plain language of the Code for what is perhaps a good reason, *Stark* contravenes the Code for no reason whatsoever.

**6.** The Memorandum filed by Beezley (acting, let us recall, pro se) in support of his motion to reopen in the bankruptcy court requested "relief

from a judgment by court after default ... by reopening the estate and permitting scheduling and listing of this debt." So styled, I must agree that the denial of this motion by the bankruptcy court did not constitute an abuse of discretion, for the reasons stated in the per curiam opinion—that is, that the "relief" requested (amendment of the schedule of creditors) was no relief at all.