**In re Roger L. HAUGE, Debtor.**

**Roger L. Hauge, Plaintiff,**

v.

**Marvin Skaar, David Torson & Dale Cox, dba Elite Air Center, Defendants.**

**Bankruptcy No. 87–31337.
Adversary No. 97–3316.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 26, 1999.

Zenas Baer, Hawley, MN, for Defendant.

Ralph W. Heuschele, Bloomington, MN, for Plaintiff.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT DALE COX

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding is before the Court on the Plaintiff's motion for summary judgment against Defendant Dale Cox. At the hearing on the motion, the Plaintiff appeared by his attorney, Ralph W. Heuschele; Defendant Cox appeared by his attorney, Zenas Baer. Upon the moving and responsive documents and the arguments of counsel, the Court makes the following order.

### BACKDROP AND HISTORY OF ADVERSARY PROCEEDING

The Plaintiff filed a voluntary petition for relief under Chapter 7 on May 7, 1987. The Plaintiff did not include entries for any of the Defendants as creditors in the schedules for his case. By an order entered on August 26, 1987, the Plaintiff received a discharge under Chapter 7.

In March, 1997, Defendant Cox sued the Plaintiff in the Minnesota State District Court for the Seventh Judicial District, Clay County. In his complaint, he alleged that the Plaintiff was indebted to him for services rendered between August, 1985 and January, 1986. In response, the Plaintiff commenced this adversary proceeding on November 13, 1997. Through his original and amended complaints, he sought a determination that all claims that the Defendants held against him as of May

7, 1987 were discharged in the course of BKY 3–87–1337.[1]

The Plaintiff then moved for an order preliminarily enjoining Defendant Cox from prosecuting the Clay County District Court action pending final judgment in this adversary proceeding. Via an order entered December 24, 1997, this Court granted the motion.

Defendant Cox then answered the Plaintiff's amended complaint. He requested a judgment determining that his claim was excepted from the Plaintiff's discharge. Defendants Skaar and Torson did not serve or file answers; on motion of the Plaintiff, the Court granted default judgment against them.

As between the Plaintiff and Defendant Cox, this adversary proceeding has gone through discovery to the motion at bar.

## MOTION AT BAR

The Plaintiff now moves for summary judgment against Defendant Cox. He argues that all of the material facts under the applicable statute are undisputed and that the governing law entitles him to judgment.

In response, Defendant Cox maintains that the governing law makes certain additional facts material to the Plaintiff's claim. He then argues that his evidence shows a triable issue on the additional facts, warranting denial of the Plaintiff's motion.

## DISCUSSION

### Standards for Summary Judgment

A motion for summary judgment presents a two-step inquiry. The first question is whether there is a "genuine issue as to any material fact." FED.R.CIV.P. 56(c).[2] After this fact-oriented and evidence-centered inquiry, the question is whether the movant "is entitled to a judgment as a matter of law." *Id.*

---

1. In his original complaint, the Plaintiff named only Cox as a defendant. Via his amendment, he added Skaar and Torson.

For the purposes of summary judgment, materiality of facts is measured by whether a given fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As a result, the Court must identify the elements of the claim or defense at issue before examining the evidence of record for the existence of fact disputes. *In re Jolly's, Inc.,* 188 B.R. 832, 838 n. 7 (Bankr.D.Minn.1995). Evidence from the respective sides must then be linked to one or more of those identified elements. *In re Jolly's, Inc.,* 188 B.R. at 837. To be considered for summary judgment analysis, such evidence must be "significant" and "probative," *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir. 1990), as well as "substantial," *Krause v. Perryman,* 827 F.2d 346, 350 (8th Cir. 1987).

A plaintiff may move for summary judgment by gleaning the elements of its claim or cause of action, amassing the evidence generated by its investigation and discovery, and then "point[ing] out," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), that the evidence meets all of the elements and does not establish any affirmative defense. *In re Mathern,* 137 B.R. 311, 314 (Bankr. D.Minn.1992), *aff'd,* 141 B.R. 667 (D.Minn. 1992). *See also In re Jolly's, Inc.,* 188 B.R. at 838. When a plaintiff comes forward on this strategy, the defendant may avoid a grant of summary judgment in three ways.

The first way goes purely to the factual aspects of the proceeding. A defendant would follow it if it accepted the plaintiff's recitation of the elements of its claim as legally correct, but disputed the plaintiff's proof on them. In such a posture, a defendant can avoid summary judg-

---

2. FED R.BANKR.P. 7056 makes this rule applicable to this adversary proceeding.

ment by producing significant, probative, and substantial admissible evidence that denies the existence of one or more of the elements, or that would establish a pleaded affirmative defense. *In re Johnson,* 139 B.R. 208, 214 (Bankr.D.Minn.1992).[3] If the defendant's evidence has the requisite weight, it will then be entitled to a trial (if the controverted evidence goes to the plaintiff's claim), or to judgment in its favor (if the plaintiff does not produce evidence to challenge the factual basis of the affirmative defense).

■ The second way goes purely to the legal dimension. If the defendant concedes the facts asserted by the plaintiff, it can argue that the governing law supports judgment in its favor, rather than in the plaintiff's. This path is used, for example, to obtain judicial construction of the terms of a contract, *e.g., United States Fidelity and Guaranty Co. v. Housing Auth. of the City of Poplar Bluff,* 114 F.3d 693 (8th Cir.1997), or to determine whether an agreement is enforceable under public policy considerations, *In re Mathews,* 207 B.R. 631, 638 n. 8 (Bankr.D.Minn.1997).

■ The third way is less commonly seen, and involves both legal and factual considerations. The defendant may acknowledge those facts that the plaintiff posits, but disagree with the plaintiff's characterization of the scope of material facts. The defendant would argue that the plaintiff must prove additional or alternative elements, and then would assert one of two things: there is no evidence to support one or more of them, or the evidence makes out a triable dispute on them. If the defendant's identification of the elements is correct, the first sub-path could lead to a grant of summary judgment for the defendant, absent rebuttal by the plaintiff. The second could result in the denial of the plaintiff's motion, and a trial on the merits.

Defendant Cox has responded to the Plaintiff's motion with the last approach just described. It is appropriate to first identify the acts, events, and circumstances that are not in controversy.

**Undisputed Facts**

1. Before his bankruptcy filing, the Plaintiff was engaged in the brokerage or sale of insurance benefit packages to banks and other business entities in Minnesota, North and South Dakota, and Montana. During 1985, he began working out of an office in Fargo, North Dakota, while retaining his residence in the Minneapolis–St. Paul metropolitan area.

2. Soon after he started, the Plaintiff began working in consort with Defendants Skaar and Torson. Skaar and Torson were to locate prospective clients, to make the first contacts with them, and then to accompany the Plaintiff for an initial call at the clients' places of business.

3. At that time, Defendant Cox ran a charter air transport business and brokered the sale of airplanes.

4. Through Skaar, the three made arrangements with Defendant Cox for chartered flights to prospective clients' places of business, and to and from the Plaintiff's place of residence.

5. For the first several months in which Defendant Cox provided charter service to the three, the billing and payment for his service were handled rather loosely. In the spring of 1986, however, the Plaintiff, Skaar, and Torson established a joint account for the segregation of funds to pay their combined business expenses, including Defendant Cox's charges. This account was termed "the HTS Account." The Plaintiff's Fargo office manager administered it, taking deposits from the three, receiving Defendant Cox's billings, and making payment on this and other debts as appropriate.

---

3. In the latter instance, the burden would shift to the plaintiff; it would have to bring forward evidence of the same quality, to make

out a triable issue of fact on the affirmative defense.

6. From June 1986 through early 1988, Defendant Cox billed for his current services to the HTS Account and the Plaintiff's office manager paid him out of the account.

7. The Plaintiff, Skaar, and Torson terminated their association in 1988. After that, the HTS Account and its participants had no remaining obligation to Defendant Cox for any services rendered after June 1, 1986.

8. When he filed for bankruptcy in May, 1987, the Plaintiff did not include an entry for Defendant Cox on any of the debt schedules he submitted with his petition. Defendant Cox's name and address were not among those on the mailing matrix used by the clerk of this Court for the case.

9. The "Notice of Chapter 7 Bankruptcy Case" issued for the plaintiff's case by the clerk of this Court on May 27, 1987, fixed September 24, 1987, as the last day to timely file a proof of claim, and August 25, 1987, as the last day to timely file complaints under 11 U.S.C. § 523(c) and former 11 U.S.C. § 15727(a).

10. The Plaintiff never requested the clerk of this court to add Defendant Cox to the records or matrix for his case pursuant to former LOC. R. BANKR. P. (D.MINN.) 112(b). Nor did he file an amended A Schedule to add a claim for him, as provided under former LOC. R. BANKR. P. (D.MINN.) 112(f).

11. As a result, Defendant Cox never received formal notice of the Plaintiff's bankruptcy filing or of the pendency of his case, from the clerk of this Court.

12. Defendant Cox never filed a proof of claim in the Plaintiff's case, and never filed a complaint against the Plaintiff for determination of dischargeability of debt.

13. The Plaintiff never obtained services from Defendant Cox through the use

of a false representation, a false pretense, or actual fraud; by defalcating on a fiduciary duty to Defendant Cox, through larceny, or through embezzlement; or with any willful or malicious intent to harm Defendant Cox or his financial interests.

14. Between June 19, 1987 and June 15, 1989, the original and successor trustees of the Plaintiff's bankruptcy estate abandoned several assets. On June 29, 1989, the successor trustee filed a Report in No–Asset Case, stating that there was

> no property available for distribution from the estate over and above that exempted by the [Plaintiff].

On August 15, 1989, the Court entered an order closing the case and discharging the successor trustee.[4]

### Governing Substantive Law

These are the sum total of facts on which the parties agree. The question is whether they, against the evidentiary record otherwise presented, mandate relief for the Plaintiff.

The dischargeability of a debt that did not formally appear on a debtor's bankruptcy schedules is governed by 11 U.S.C. § 523(a)(3):

> (a) A discharge under [11 U.S.C. § ] 727 ... does not discharge an individual debtor from any debt—
>
> ...
>
> (3) neither listed nor scheduled under [11 U.S.C. § ]521(1) ... with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—
>
> (A) if such debt is not of a kind specified in [11 U.S.C. §§ 523](a)(2), (4), or (6) ... timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case

---

4. Though counsel for both parties referred to the unproductive administration of the estate in their argument or memoranda, neither made a documentary record on the point.

The history was gleaned from the docket and file for the case, after judicial notice was taken.

in time for such timely filing; or

(B) if such debt is of a kind specified in [11 U.S.C. §§ 523(a)] (2), (4), or (6) ..., timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request ... [5]

■ Over a decade ago, Judge Robert J. Kressel of this Court observed that the language of this and its related provisions in the Bankruptcy Code and Rules are not easily understood on a first reading, and raise difficult questions. *In re Anderson,* 72 B.R. 495, 496 (Bankr.D.Minn.1987). *Accord, In re Beezley,* 994 F.2d 1433, 1435 (9th Cir.1993) (O'Scannlain, J., *concurring* ) (terming language of § 523(a)(3) "convoluted"). The statute, however, does reflect one bedrock precept: the effect of discharge on any debt is final upon the grant of general discharge in a bankruptcy case, without regard to future events, though parties may require a post-discharge adjudication of the nature of that effect. *In re Anderson,* 72 B.R. at 497.

■ In a companion decision, *In re Anderson,* 72 B.R. 783 (Bankr.D.Minn. 1987), Judge Kressel gleaned the circumstances that bear on the dischargeability of a debt omitted from the formal schedules for a bankruptcy case. He framed them almost entirely in the light of a debtor's unintentional or inadvertent omission. In such a case, Judge Kressel opined, § 523(a)(3) "is designed to remedy the harm to creditors that results from not being able to participate in the bankruptcy case." The statute countenances two different modes of creditor participation: by sharing in a distribution from an asset-bearing estate, and by obtaining a determination of dischargeability on debts within the scope of 11 U.S.C. § 523(c). *In re Anderson,* 72 B.R. at 786. *See also, In re Stone,* 10 F.3d 285, 291 (5th Cir.1994); *In re Soult,* 894 F.2d 815, 817–818 (6th Cir. 1990); *In re Rosinski,* 759 F.2d 539, 542 (6th Cir.1985); *In re Bowen,* 89 B.R. 800, 805 (Bankr.D.Minn.1988) (all recognizing that § 523(a)(3) redresses deprivations of these two forms of creditor participation, and only these two forms). Thus, where an omitted creditor is prevented from exercising one or both of these two rights under bankruptcy law, it should retain its pre-petition rights under state law notwithstanding the debtor's receipt of general relief in bankruptcy. *In re Anderson,* 72 B.R. at 786.

■ Judge Kressel recognized a corollary proposition, something of a "no harm, no foul" rule. If a debtor amends his schedules to add the subject debt after the initial filing and notifies the creditor of the pendency of the bankruptcy case, or if the creditor receives informal notice or actual knowledge of the case in some other way, and if either of those things takes place in time for the creditor to timely file a proof of claim and to receive distribution, the creditor cannot complain of prejudice to its distribution rights and the debt is dischargeable. 72 B.R. at 787. *See also In re Jongquist,* 125 B.R. 558 (Bankr. D.Minn.1991).[6] Similarly, if the debtor's was noticed and administered as a "no-asset case"-one in which no deadline to file claims is fixed because the debtor's schedules do not show non-exempt assets, and none emerge during the trustee's administration—an omitted creditor cannot complain of prejudice to its right to claim a

---

5. The language of this statute, and of all other cited statutes, rules, and forms, is that which was on the books in 1987. That version was the law applicable to the Plaintiff's bankruptcy case, and hence is the law applicable to this adversary proceeding.

6. *Jongquist,* however, correctly stands for the proposition that *any* prejudice to distribution rights requires an exception from discharge for the *whole* debt. Section 523(a)(3) does not recognize de minimus prejudice, or waive its harsh consequence for it. 125 B.R. at 560.

distribution. Therefore, it has no right to a judgment of nondischargeability under § 523(a)(3) unless it can demonstrate prejudice of the other recognized sort. 72 B.R. at 787–788.

■ The second sort of prejudice arises if the debt is of the kind subject to a determination of nondischargeability under 11 U.S.C. § 523(c).[7] If the debt was of this class, dischargeability will turn on whether the debtor later scheduled the creditor's claim, or whether the creditor later received informal notice or actual knowledge of the case, so as to permit it to timely file a complaint to determine dischargeability under 11 U.S.C. § 523(c), *and* to timely file a proof of claim. 72 B.R. at 788.

Judge Kressel's analysis was subject to a threshold qualification: it applied "[a]bsent a showing of fraud or intentional omission." 72 B.R. at 787 (citing *In re Baitcher*, 781 F.2d 1529, 1534 (11th Cir. 1986) and *In re Stark*, 717 F.2d 322, 324 (7th Cir.1983)). Because the facts in *Anderson* did not suggest either fraud or intentional omission on the part of the debtor there, Judge Kressel did not explain or expand upon the qualification.[8]

■ The specific no-harm-no-foul rule that Judge Kressel framed, however, was expressly to be applied only in a no-asset case where the clerk had not fixed a deadline for the timely filing of proofs of claim.[9] A case where the clerk has fixed this deadline, however, is "a very different kind of bankruptcy," and the courts should avoid the "incautious use of [the] standard outside the context in which it originated ..." *In re Beezley*, 994 F.2d at 1440 n. 5.

In such a case, if the deadline for "timely filing of a proof of claim," § 523(a)(3)(A), passes without the omitted creditor having received notice or actual knowledge of the case, the statute on its face requires that the debt be excepted from discharge. *In re Laczko*, 37 B.R. 676, 678–679 (9th Cir. BAP 1984), *aff'd*, 772 F.2d 912 (9th Cir. 1985); *In re Corgiat*, 123 B.R. 388, 391 (Bankr.C.D.Cal.1991); *In re Iannacone*, 21 B.R. 153, 155 (Bankr.D.Mass.1982). *See also In re Smith*, 21 F.3d 660 (5th Cir. 1994) (issue raised in Chapter 11 case, after confirmation but before beginning of debtors' distribution to unsecured credi-

---

7. That is, if its creation was induced by the use of a false representation, a false pretense, or actual fraud within the contemplation of 11 U.S.C. § 523(a)(2); was brought about by the defalcation of a fiduciary, an embezzlement, or larceny within the scope of 11 U.S.C. § 523(a)(4); or was created by the willful and malicious infliction of injury within the scope of 11 U.S.C. § 523(a)(6).

8. As Judge Kressel discussed at length in the first *Anderson* decision, 72 B.R. at 497, most courts up to that time had treated the dischargeability of omitted debts in a procedural context initiated by erroneous action on the part of the debtor: a motion for leave to reopen a closed bankruptcy case, as a prerequisite to amending a debt schedule to add the previously-omitted creditor. The thought behind the procedure is that somehow this perfunctory act could newly subject the claim in question to the earlier-granted discharge. Though these courts assigned significance to the wrong procedure and the wrong time, their decisions nonetheless can add to an understanding of the real governing law, § 523(a)(3). *Id.* One must, however, be careful to winnow the illuminating thoughts out of

the surrounding matrix, and to be wary of logic that might be cast awry by an erroneous assumption as to the procedure through which the issue is correctly addressed. *Id.*

9. Many courts use the unfortunate shorthand of "claims bar date" or "bar date" for the deadline contemplated by FED. R. BANKR. P. 3002(c). As Judge Kressel pointed out in *In re Hausladen*, 146 B.R. 557, 559–560 (Bankr. D.Minn.1992) (*en banc*) the deadline functions only to separate timely-filed claims from untimely-filed claims. Late filing *per se* does not "bar" either allowance or distribution, which are governed by other provisions of the Bankruptcy Code and Rules. In structuring 11 U.S.C. § 502(b)(9) to require positive action to disallow untimely-filed claims, Congress appears to have acknowledged *Hausladen's* most basic premise—this notwithstanding a floor statement to the effect that § 502(b)(9) "is designed to overrule *Hausladen*." 140 CONG. REC. H 10,764, H10,768 (daily ed. Oct. 4, 1994) (statement of Rep. Brooks).

tors; holding that claim of omitted unsecured creditor was nondischargeable where it had not received knowledge or actual notice before claim filing deadline, even though debtors proposed to integrate its claim into payment process). Its terms do not distinguish between deadline-fixed cases in which estates ultimately bear assets, and those in which they do not. *Laczko*, 37 B.R. at 678–679; *Iannacone*, 21 B.R. at 155. Nor does the statute attach any consequence to the possibility that an omitted creditor that missed the deadline might yet receive distribution, if it satisfies the requirements of 11 U.S.C. § 726(a)(2)(C).[10]

At least one court has extended the no-harm-no-foul rule to the deadline-fixed no-asset case. *In re Soult*, 894 F.2d 815, 817 (6th Cir.1990). In order to do so, however, the *Soult* court posed the remedy of reopening the case and allowing the debtor to amend the debt schedules. 894 F.2d at 817. To reach the result as apparently sought, this was necessary: the statute's very language otherwise compels a contrary outcome, and only the use of the erroneous remedy "permits the relation back nunc pro tunc of the scheduling,"

*Beezley*, 994 F.2d at 1440 n. 5. Other courts have relied more generally on a variant no-harm-no-foul rule, after holding that the debtor had not intentionally or fraudulently omitted the creditor in the first place and therefore had the clean hands of a proper supplicant for equity. *In re Stone*, 10 F.3d 285, 291–292 (5th Cir.1994); *In re Sandoval*, 102 B.R. 220, 222 (Bankr.D.N.M.1989).

The theories of both of these lines of cases offer neither a predictability of result nor a tenable rationale, given the "plain meaning" approach that the Supreme Court has applied repeatedly in its bankruptcy jurisprudence for over a decade. *E.g., U.S. v. Ron Pair Ents., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (applying 11 U.S.C. § 506(b); noting that "[t]he plain meaning of legislation should be conclusive," except in the rare case; and stating that ordinarily "[t]he sole function of the court is to enforce [the statute] according to its terms").[11]

The governing law for this matter, then, is on the face of the statute; the judicially-recognized no-harm-no-foul rule does not reach the procedural history presented

---

**10.** Subject to exceptions not applicable here, this statute gives a second-priority right to distribution from the estate

> in payment of any allowed unsecured claim . . ., proof of which is—
>
> . . .
>
> (C) tardily filed under [11 U.S.C. §] 501(a) . . ., if—
>> (i) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under [§] 501(a) . . .; and
>> (ii) proof of such claim is filed in time to permit payment of such claim . . .

Tardily-filed claims of this sort share this priority with two types of *timely*-filed claims, identified in §§ 726(a)(2)(A)-(B). From this wording, Congress clearly contemplated a material difference between timely- and tardily-filed claims. That distinction suggests that the identification of "timely" filing in § 523(a)(3)(A) creates a classification that must be enforced just as it reads. *See Commissioner v. Lundy*, 516 U.S. 235, 250, 116

S.Ct. 647, 133 L.Ed.2d 611 (1996); *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); *United States v. Regents of the Univ. of Minnesota*, 154 F.3d 870, 875 (8th Cir.1998) (all noting normal rule of construction that identical words used in different parts of same act must be assigned same meaning).

**11.** *See also Rake v. Wade*, 508 U.S. 464, 472–473, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993); *Patterson v. Shumate*, 504 U.S. 753, 757, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642–644, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson*, 503 U.S. 393, 395–402, 112 S.Ct. 1386, 118 L.Ed.2d 39; *U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 33–37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas*, 502 U.S. 151, 161–162, 112 S.Ct. 527, 116 L.Ed.2d 514 (1992); *Toibb v. Radloff*, 501 U.S. 157, 160–161, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); *Hoffman v. Connecticut Dept. of Income Maintenance*, 492 U.S. 96, 101–102, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (plurality opinion).

here. Under § 523(a)(2)(A), the issue of whether Defendant Cox had notice or actual knowledge of the Plaintiff's bankruptcy filing before the claims filing deadline is material.

### The Disputed Facts

 On that point, the parties' affidavits show a sharp dispute:

1. While the Plaintiff acknowledges that he did not schedule Defendant Cox as a creditor, he professes not to know why he did not. He opines that it may have been because all of their business was transacted through his own corporation and the HTS Account, because Cox never issued a billing to him, and because he thought that he had no individual liability to Cox.

2. Defendant Cox, on the other hand, states that the Plaintiff told him by the end of 1985 that he-the Plaintiff—would be personally responsible for all of Cox's charges for air transportation up to that point, with the HTS Account mechanism to handle all those going forward.

3. The Plaintiff states that he discussed his worsening financial condition with Defendant Cox "on many occasions," and that he is now "sure" that he told Cox about his bankruptcy filing as soon as he "knew that it had happened."

4. Defendant Cox, however, insists that he "never discussed any of [the Plaintiff's] financial problems with him, and [the Plaintiff] never told [Cox] he was going bankrupt."

5. The Plaintiff states that in early 1988 Defendant Cox demanded payment from him "for some airplane thing"; that though he was "quite certain" that Cox "had been fully paid for all of his billings" to the HTS Account, the Plaintiff proposed to satisfy Cox by having Ralph Heuschele, his lawyer, collect debts for Cox; and that he fended off Cox's later payment demands for over eight years by telling him that they would discuss the nature of the debt and terms of payment when his finances "were in sufficiently good condition."

6. Defendant Cox avers that he "was not informed about the [Plaintiff's] bankruptcy until it was all completed," and that the Plaintiff then told him he had omitted him and the other Defendants from the schedules "intentionally because he did not want to stiff his friends."

### Consequences of the Facts, Disputed and Undisputed

Under the undisputed facts, the Plaintiff has met a portion of the requirements of § 523(a)(3). Defendant Cox produced no evidence to support a determination that his claim was nondischargeable under § 523(c). The omission of his claim from the schedules thus did not deprive him of the opportunity to obtain judgment to that effect in the Plaintiff's case. This makes the exception to discharge of § 523(a)(3)(B) inapplicable.

Because a deadline for the filing of claims was fixed in the Plaintiff's case, the concept of "timely filing" is activated and § 523(a)(3)(A) applies without the escape of *Anderson's* no-harm-no-foul rule. Going right to the central element of § 523(a)(3)(A), there is a fact dispute over whether the Plaintiff made early disclosure of the bankruptcy filing to Defendant Cox, with or without blandishments on his intent to make payment to him. The Plaintiff must prove that Cox received informal notice or actual knowledge of his bankruptcy filing long enough before the deadline to have enabled him to timely file a proof of claim. *In re Faden,* 96 F.3d 792, 795 (5th Cir.1996); *United States v. Bridges,* 894 F.2d 108, 111 (5th Cir.1990) (both holding that debtor has burden of proof on this issue). The dispute on this point between the parties' written statements under oath can only be resolved through a trial.

### CONCLUSION

The dischargeability of Defendant Cox's claim hinges on the disputed fact issue,

which is fairly narrow. Because there is little or no hard evidence going to the Plaintiff's disclosure or non-disclosure to Cox, a premium will be put on the credibility of the witnesses and on the integrity of the narrative content of their testimony. In the meantime, however, the Plaintiff is not entitled to summary judgment.

IT IS THEREFORE ORDERED that the Plaintiff's motion for summary judgment is denied.