**In re MAI YER MOUA, Debtor.**

**Croix Oil Co., a Minnesota corporation, Plaintiff,**

v.

**Mai Yer Moua, Defendant.**

**Bankruptcy No. 09–38291.**

**Adversary No. 10–3226.**

United States Bankruptcy Court, D. Minnesota.

Oct. 14, 2011.

**756**

Hannah R. Stein, Matthew T. Collins, Fabyanske Westra Hart & Thomson, Minneapolis, MN, for Plaintiff.

Sean Michael Linnan, Linnan & Associates Law Firm LLC, St. Paul, MN, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came before the Court on April 8, 2011, on the Plaintiff's motion for summary judgment. The Plaintiff appeared by its attorney, Matthew T. Collins. The Defendant appeared by her attorney, Sean M. Linnan. The following memorandum sets forth the Court's disposition of the motion, which is granted.

This is an adversary proceeding for determination of dischargeability of debt.[1] 11 U.S.C. § 523(a)(3)(A) is the applicable statute:

(a) A discharge under [11 U.S.C. § ] 727 ... does not discharge an individual debtor from any debt—

. . . .

(3) neither listed nor scheduled under [11 U.S.C. § ] 521(1) ..., with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

(A) if such debt is not of a kind specified in [11 U.S.C. §§ 523(a) ](2), (4), or (6) ..., timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; ...[2]

The parties' dispute is one of those oddments that can arise only in the context of bankruptcy: it sprang out of the procedural dynamic of bankruptcy; its outcome is driven by the dictates of that dynamic; and all of that is quite abstract, a matter of necessary court processes and the relevant parties' participation or non-engagement in them. Nonetheless, the outcome bodes a real, substantive impact on both the Plaintiff and the Defendant; it will control the Plaintiff's right as a pre-bankruptcy creditor of the Defendant to enforce its claim against her in the wake of her bankruptcy filing. Ultimately, the result is dictated by what happened in the Defendant's case under Chapter 7.

More than two decades ago, it was observed that "[s]ection 523(a)(3) is designed to remedy the harm to creditors that results from not being able to participate in the bankruptcy case." *In re Anderson,* 72 B.R. 783, 786 (Bankr. D.Minn.1987) (citing *Stark v. St. Mary's Hospital,* 717 F.2d 322, 324 (7th Cir.1983)). Only two forms of creditor participation are protected via the statute's exception from discharge, however. *Id.* Under § 523(a)(3)(A), "the right of the creditor that is protected ... is the right to timely

---

**1.** As such, it is a core proceeding in the Defendant's bankruptcy case, 28 U.S.C. § 157(b)(2)(I), hence within the bankruptcy jurisdiction of the federal courts, 28 U.S.C. § 1334(b), and subject to entry of final judgment at the order of a bankruptcy judge, 28 U.S.C. § 157(b)(1).

**2.** It is not disputed that the underlying debt is not one of those subject to exception from discharge under 11 U.S.C. §§ 523(a)(2), 523(a)(4), or 523(a)(6). Thus, the alternate provision that can make an unscheduled debt nondischargeable, § 523(a)(3)(B), does not apply here.

file a proof of claim," and hence to participate in a distribution from the bankruptcy estate on a parity with creditors holding claims of the same statutory priority. *Id.* (parenthetical summarizing observation in *Stark v. St. Mary's Hospital*).

For the motion at bar, the material facts[3] are all undisputed. They are either admitted by the Defendant in her answer, or they are gleaned from the docket and the sequence of proceedings and administration in BKY 09–38291, the Defendant's case. In sum, the material facts are:

1. In 2007, the Defendant signed a personal guaranty in favor of the Plaintiff, as to an agreement between the Plaintiff and Jesse Thao Services for the provision of BP-branded gasoline for resale at retail. The underlying agreement was later assigned to a third party. However, the Plaintiff never released the Defendant from the guaranty.

2. On October 8, 2009, the Plaintiff commenced suit against the Defendant and a number of other persons, for breach of contract on the 2007 agreement. The action was venued in the Washington County, Minnesota District Court. The record contains proof of service on the Defendant of the Plaintiff's summons and complaint in that action, via personal service on her roommate (and co-defendant) on October 8, 2009.

3. The Defendant filed a voluntary petition for relief under Chapter 7 on November 24, 2009, commencing BKY 09–38291.

4. The Defendant's debt schedules did not include an entry for a claim in favor of the Plaintiff. Nor were the Plaintiff's name and address included on the address matrix for notice to creditors that the Defendant's counsel included in the initial filing.

5. Pursuant to standard practice in this district, the Defendant's bankruptcy case was originally denominated and administered as a no-asset case pursuant to Fed. R. Bankr.P. 2002(e); that is, no deadline was fixed for the timely filing of creditors' proofs of claim and no notice of such a deadline was sent to creditors.

6. On February 11, 2010, the Trustee filed a notice that assets would be administered for the payment of creditors' claims. The clerk then sent notice to all matrix-identified creditors of a deadline of May 17, 2010 for the filing of proofs of claim pursuant to Fed. R. Bankr.P. 3002(c)(5).

7. On May 28, 2010, the Washington County District Court ordered entry of a default judgment against the Defendant and two of her co-defendants, in the Plaintiff's lawsuit there. After a modification for an award of attorney's fees, the total judgment in favor of the Plaintiff against the Defendant came to $194,343.72.

8. On July 8, 2010, the Defendant's counsel filed an amended Schedule D in BKY 09–38291, adding an entry for the Plaintiff as a secured creditor. The collateral was described as the commercial property

---

**3.** For the purposes of summary judgment, the materiality of facts is determined by whether they "might affect the outcome of the suit under the governing law." *Anderson v. Liber-* *ty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, the governing law is the statute, as judicially construed by applicable case law.

on which the supplied gas station had been operated.

9. The Plaintiff has never filed a proof of claim pursuant to 11 U.S.C. § 501(a). The Defendant and her attorney have never filed a proof of claim on behalf of the Plaintiff pursuant to 11 U.S.C. § 501(c).

10. The Plaintiff was unaware of the Defendant's bankruptcy filing until July 8, 2010, when it was notified (apparently by the Defendant's counsel) of the amended Schedule D. The Plaintiff (apparently through counsel) then learned that the deadline for timely filing a proof of claim had already passed.[4]

11. On October 29, 2010, the Plaintiff commenced this adversary proceeding.

12. On December 21, 2010, the Trustee filed her final report and proposed distribution in BKY 09–38291. Her proposed administration of the estate did not include a distribution to the Plaintiff. The associated notice to creditors set a deadline of January 18, 2011 for objections to the proposed distribution.

13. No one filed an objection to the Trustee's proposed distribution, timely or otherwise.

■ Under the construction that has prevailed in this district, § 523(a)(3) is applied according to its plain language, and strongly in mind of the orientation of the statutory text toward the *process* of bankruptcy. The statute recognizes "sharing and distribution from an asset-bearing [bankruptcy] estate" as one of the means by which a creditor participates in the bankruptcy process to its potential benefit. *In re Hauge*, 232 B.R. 141, 147 (Bankr.

D.Minn.1999) (citing *In re Anderson*, 72 B.R. at 786). The Plaintiff maintains that it was deprived of this right once the deadline for timely filing proofs of claim in an asset-bearing bankruptcy case had passed, while the Defendant's status in bankruptcy and the date of the deadline were both unknown to the Plaintiff. The Plaintiff argues that that alone is sufficient to except the full debt from discharge, under *Hauge's* reasoning.

That would be the end of the story, under the state of analysis in local case law when *Hauge* was issued. 232 B.R. at 141 (in case where clerk issues notice of deadline for timely filing of proofs of claim against asset-bearing estate, creditor that was omitted from debtor's bankruptcy schedules and that did not have actual notice of debtor's bankruptcy filing in time to meet deadline is entitled to exception from discharge, under plain meaning of § 523(a)(2)(A)). However, the Defendant resists this motion by invoking a chain of published decisions from other districts, in particular *In re Ricks*, 253 B.R. 734 (Bankr.M.D.La.2000).

Of the eight decisions cited by the Defendant, two are entirely off-point; they involved cases noticed and administered as no-asset cases. *See In re Baskowitz*, 194 B.R. 839 (Bankr.E.D.Mo.1996) and *In re Hendricks*, 87 B.R. 114 (Bankr.C.D.Cal. 1988). Under the no-harm, no-foul rule first framed by Judge Kressel, "[c]ourts . . . view[ ] no-asset cases differently under § 523(a)(3) because . . . proofs of claim are either unnecessary or not accepted for filing" in them. 72 B.R. at 787. Where the initial notice of the case includes a statement that "it appears from the [debtor's] schedules that there are no assets from which a dividend can be paid," Fed. R.

---

**4.** The Defendant admitted these facts in her answer, by admitting ¶¶ 16 and 17 of the Plaintiff's amended complaint.

Bankr.P. 2002(e), and hence it is unnecessary to file claims, *id.,* a deadline under Fed. R. Bankr.P. 2002(a)(7) and 3003(c)(3) will not be set or specified in that notice. Until a trustee "notifies the court that payment of a dividend appears possible," Fed. R. Bankr.P. 3002(c)(5), and the clerk issues a notice of a deadline now-specified, *id.,* there is no prejudice to an unscheduled and unknowing creditor in the matter of administration of the estate. Because it would have no chance of receiving a distribution anyway, such a creditor suffers no harm from losing the abstract opportunity to participate in the case. In such no-asset cases, unscheduled debts are not excepted from discharge. *See Judd v. Wolfe,* 78 F.3d 110, 115 (3d Cir.1996). The status of *Baskowitz* and *Hendricks* as no-asset cases therefore makes their discussion irrelevant to the issue at bar.

Of the remaining six decisions, only *Ricks* warrants any discussion. The balance are either short in length of text or light on analysis; they turn in part on the lack of ultimate prejudice to a plaintiff-creditor because the case closed without distribution despite having been noticed as asset-bearing; or they rely on the dicta in *Hendricks.*[5]

The Court in *Ricks,* however, took large pains to rationalize a dispensation for debtors in situations like the one at bar. It did so by invoking the "holistic approach" to statutory construction, under which provisions of a comprehensive enactment that are extraneous to the one that specifically governs the subject matter in suit are considered in order to determine the meaning of words in the governing provision. The Defendant cites *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), for her proposition that "[s]tatutory construction *is* a holistic endeavor" (emphasis added). The analysis of *Ricks* also cites *Timbers of Inwood Forest* as authority.

■ However—and both *Ricks* and the Defendant elide this—*Timbers of Inwood Forest* specifies two situations where a holistic approach is appropriate: (1) when "[a] provision that may seem ambiguous in isolation is [ ] clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear;" or (2) "because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." 484 U.S. at 371, 108 S.Ct. 626. Both of these situations involve statutory provisions that are ambiguous on their face, or are subject to more than one "permissible meaning" when read in isolation. And, even when an appellate court has chosen to interpret a provision of the Bankruptcy Code "in light of the remainder of the statutory scheme" without first finding ambiguity, it has done so based on "[s]everal provisions of the bankruptcy code," not just one, that demonstrate an underlying principle guiding the entire Code. *See, for example, In the Matter of Howard,* 972 F.2d 639, 640 (5th Cir.1992) (finding that § 1327(a)-(c) must be read in conjunction with §§ 501, 502(a), 506(a), Fed. R. Bankr.P. 3001 and 3007, all provisions "provid[ing] special procedures to protect secured creditors and their liens." *Id.* at 640.). In other words, in the absence of ambiguity or structural inconsistency, there is no need to go beyond the plain language of the statute. *United States v. Ron Pair Ents., Inc.,* 489 U.S. 235, 240–241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

---

**5.** *See In re Kuhr,* 132 B.R. 421 (Bankr. E.D.Cal.1991); *In re Brosman,* 119 B.R. 212 (Bankr.D.Alaska 1990); *In re Sandoval,* 102 B.R. 220 (Bankr.D.N.M.1989); *In re Butt,* 68 B.R. 1001 (Bankr.C.D.Ill.1987); *In re Beshensky,* 68 B.R. 452 (Bankr.E.D.Wis.1987).

The *Ricks* court built its rationale on the presence of 11 U.S.C. § 726(a)(2) in the statutory regimen that governs filed claims in the administration of the estate. As a whole, § 726(a)(2) assigns second priority in payment from a Chapter 7 estate, to:

> ... any allowed unsecured claim, ... proof of which is—
>
> > (A) timely filed under [11 U.S.C. § ] 501(a) ...;
> >
> > (B) timely filed under [11 U.S.C. §§ ] 501(b) or 501(c) ...; or
> >
> > (C) tardily filed under [11 U.S.C. § ] 501(a).... [6]

In turn, 11 U.S.C. § 726(a)(3) assigns third priority to:

> ... any allowed unsecured claim proof of which is tardily filed under [11 U.S.C. § ] 501(a) ..., other than a claim of the kind specified in paragraph (2)(C) of this subsection....

The net effect of §§ 726(a)(2) and 726(a)(3) is that third-priority claims can not receive distribution from the estate unless all allowed second-priority claims are paid in full. This, of course, is the harm that can result from an otherwise-allowable unsecured claim remaining unscheduled, and its holder remaining unaware of the bankruptcy case: the probable disbursement of the full estate to other unsecured claimants and the loss of the right to a pro rata share of the funds distributed.

Section 726(a)(2)(C), however, offers a haven to the late-coming claimant, as long as the herd has not left the barn. As the *Ricks* court would have it, the mere presence of this provision in the statute saves the day for the delinquent debtor in a different context, when an omitted creditor seeks an exception from discharge under § 523(a)(3)(A). 253 B.R. at 743–747.

*Ricks* was issued after *Hauge*. Though *Hauge* cited the express distinction between "timely" and "tardily" filed claims in § 726(a)(2)(C) as evidence that "Congress clearly contemplated a material difference" between them, "a classification that must be enforced just as it reads" in § 523(a)(3)(A), 232 B.R. at 149 n. 10, the *Ricks* court terms that "a distinction without meaning in the context of § 726(a)(2)," 253 B.R. at 745.

Ricks's rationale ignores the clear import of the pivotal word within the relevant provision, § 523(a)(3)(A). And, even if Ricks's forced "holistic" analysis is examined on its terms, its abstractions do not fit into the actual, hands-on administration of bankruptcy estates. Section 726(a)(2) governs that process, yes; but because § 523(a)(3)(A) protects a right to meaningfully participate in the estate, actual administrative performance is the context that has to be considered in determining the congressional intent behind its words. The practicalities of bankruptcy administration frame the meaning of the Code's vocabulary in both instances.

*Ricks* gives overpowering meaning to the mere presence of § 726(a)(2)(C) in the statutory ordering of claims. Section 726(a)(2)(C) permits tardily-filed claims to be *treated* as if they had been timely-filed claims. But, it merely advances them in priority, upon the satisfaction of two specified requirements. Such claims are still, in their original assertion, tardily filed. The statute does not *make* or even *deem* them timely-filed claims.

In turn, § 523(a)(3)(A) categorizes a claim by the act of *filing,* qualified by its timeliness. It does not refer to the ultimate *treatment* of the claim, as that may

---

**6.** Exceptions in the prefatory language exclude from the second priority those claims that are otherwise described and prioritized in 11 U.S.C. §§ 726(a)(1), 726(a)(3), and 726(a)(4).

be reprioritized regardless of its original timeliness. The deliberate choice of vocabulary in 523(a)(3)(A) undercuts *Ricks's* ruling, 253 B.R. at 746–747, that the word "tardily" has no meaning in reference to the deadline where § 726(a)(2)(C) applies. The dicta in *Hauge*, 232 B.R. at 149 n. 10, is still viable in its analysis. The use of the one word "timely," with its unmistakable meaning, unequivocally communicates one thing: the simple right to file a claim timely, untrammeled by any issue over its priority within § 726(a)(2)-(3), is the creditor participation that is vindicated by the provision for nondischargeability under § 523(a)(3)(A).

The actual function of estate administration by trustees bears this out. As trustees administer estates every week in this district, tardily-filed claims do not get the advancement of § 726(a)(2)(C) automatically—even if the tardily-filing creditor asserts a right to it on the proof of claim or elsewhere.[7] The reasons are obvious if one recognizes the actual legalities, mechanics, and function of estate administration. They are at least two-fold.

The first comes out of the legal underpinnings of the trustee function. A trustee coming across a tardily-filed claim on the court's register can not just plop it into the basket for second priority, on his own initiative. The statute requires a specific historical circumstance, of a subjective character, as a threshold matter: that "the creditor . . . did not have actual notice or actual knowledge of the case in time for timely filing. . . ." This is the sort of legal

requirement that requires an adjudication of a fact, on some sort of evidence. Under the fundamental division between the judicial and administrative functions in bankruptcy—a basic feature of the law since the current Code became effective in 1979—a trustee does not have this power. No responsible trustee would purport to exercise it, on a tacit basis, by giving a creditor the benefit of the doubt on the issue of actual notice or knowledge, and slipping a tardily-filed claim into second priority. That would be a violation of the trustee's obligation to treat all claims according to their proper tenor under bankruptcy and non-bankruptcy law, on their face, and to relegate disputes over claims to the judicial process. *See* 11 U.S.C. § 704(a)(5) (including, among duties of trustee in Chapter 7 case, "if a purpose would be served, [to] examine proofs of claim and object to the allowance of any claim that is improper"). Further, a trustee might violate her general fiduciary obligation to the estate as a whole, were she to formally seek a judicial upgrade for tardily-filed claims against an insolvent estate.[8]

And then there is the practical administrative conundrum for the trustee that *Ricks* creates but does not even recognize, which comes out of the second requirement of § 726(a)(2)(C): just what is "fil[ing] in time to permit payment of [the tardily-filed] claim," in the real-life process that trustees have to follow? It is one thing to have the issue come to the trustee—or even before the court—when the

---

7. This conclusion is borne out by years of reviewing trustees' final reports and proposed distributions in asset-bearing cases under Chapter 7.

8. Creditors holding timely-filed claims would have a colorable complaint against such an action. The theory would be that a trustee has no authority to dilute diligent creditors' claims in favor of those who have not met the

deadline without proper and proven excuse. A trustee simply is not obligated to do anything for the holder of a tardily-filed claim, even if it comes in before the trustee undertakes to apportion a fully-collected estate. The lengthy discussion in *Ricks* never recognizes an onus on any party in interest to activate § 726(a)(2)(C) in a real procedure. Its rationale may assume that the trustee would do it; but that is wrong.

property of the estate has not yet been "collect[ed] and reduc[ed] to money," 11 U.S.C. § 704(a)(1). At that point, none of the evaluation of claims, prioritization, and arithmetical calculation will have been done.[9]. And, there is little practical prejudice to the trustee if the issue is pushed forward after the estate is fully collected but before the work has been put in to calculate the final division.

But what if a tardily-filed claim comes in after the trustee has filed a final report and proposed distribution, or has noticed one to creditors, but the checks have not been cut? Should the trustee be under an (uncompensated) obligation to redo and re-notice everything, to defer to the late-coming claimant at that time? And what if another tardily-filed claim came in after that, but before the checks were cut on the new calculation?

These questions are not rhetorical. They have answers as to the trustee's administration, and most of those can be formulated in practical terms—the assessment of attorney fees to make the estate whole against a creditor that does satisfy § 726(a)(2), and the like. But that is not the genesis of the matter at bar. *Ricks* assumes that the abstract presence of § 726(a)(2)(C) in the statute somehow makes it all better for the matter of timeliness under § 523(a)(3)(A). However, it does not recognize the legal limitations on a trustee's powers or the practical burden on a trustee's operation that its conclusory prescriptions imply.

When presented with these conundra at argument, the Defendant's counsel acknowledged that some sort of judicial proceeding was required for a tardily-filing creditor to gain the protection of § 726(a)(2)(C). However, he maintained

that in all situations this should be incumbent on the creditor, and it definitely was not a debtor's burden. Thus, he argued, the Plaintiff was not entitled to any deference on the issue of timeliness under § 523(a)(3)(A) because it had failed to take legal action to elevate its claim in priority when it found out about the Defendant's case in July, 2010.

That point is not the one most dispositive of his argument, but it simply cannot prevail. The Defendant's interpretation shifts the impact of a separate statutory onus entirely away from the debtor in bankruptcy—the party originally at fault—and onto a non-culpable creditor. This would not be consistent with the text and the tenor of the Bankruptcy Code, particularly since the 2005 amendments. Several provisions explicitly and implicitly require the debtor to file accurate schedules of creditors' claims in the first instance, just to protect their right to participate in the case. *E.g.,* 11 U.S.C. §§ 521(a)(1)(A) and 521(a)(1)(B)(i) (debtor shall file list of creditors and schedule of assets and liabilities, early in bankruptcy case); 11 U.S.C. § 707(a)(1) (failure to timely file information required by § 521(a)(1) is ground for dismissal of Chapter 7 case); 11 U.S.C. § 707(b)(4)(D) (attorney's signature on Chapter 7 petition constitutes certification that attorney has no knowledge that information in debtor's schedules is incorrect); *Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir. 1992) (applying 11 U.S.C. § 727(a)(4)(A); emphasizing that statements and schedules "must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the fact"); *In re Sears,* 246 B.R. 341, 347 (8th Cir. BAP 2000).

---

**9.** Even if one bought into *Ricks's* perseveration, the very last point would distinguish it from the case at bar. At the beginning and at the end of its holistic exercise, the court observes that the trustee there was still "administering assets," when the dischargeability issue came before the court, and had not made a distribution. 253 B.R. at 737 and 747.

The statutory imposition of the burden to schedule *all* creditors' claims is unequivocal. So if § 726(a)(2)(C) were properly engrafted into the construction of § 523(a)(3)(A), the broader statutory regime dictates that the debtor take action under § 726(a)(2)(C), if that were to be a hedge against nondischargeability under § 523(a)(3)(A).[10] The Defendant here did not do that.[11] The dispute was presented to the Court over two months after the Trustee was free to make distribution (i.e., after the fee applications noticed with the Trustee's proposed distribution were judicially approved by an order entered on January 20, 2011). By the date of the hearing on this motion, the herd was truly out of the barn; the Trustee had undoubtedly cut the checks to creditors of an insolvent estate, most or all of them had been cashed, and there was no practical remedy to be given under § 726(a)(2)(C).

■■ Even if the holistic approach were applied as *Ricks* premises, its analysis does not make sense in the real world of the bankruptcy process. The right to "timely" file a proof of claim, to stake out a share in the estate without the cost and uncertainty of a judicial proceeding over its priority, is the only right to participate in the bankruptcy process that is cognizable under § 523(a)(3)(A). The rationale that started in this district with *Anderson,* and went through *Hauge,* is still the only one to be applied. *Accord, In re Schlueter,* 391 B.R. 112 (10th Cir. BAP 2008). And under this analysis, the relative value of the lost distribution is irrelevant. *In re Jongquist,* 125 B.R. 558, 560 (Bankr. D.Minn.1991) (determining debt of $28,857.23 nondischargeable under § 523(a)(3)(A) despite fact that trustee had distributed total of only $54.00 to unsecured creditors, and "the most [the plaintiff-creditor] would have received was a distribution of a few dollars....."). The debt is nondischargeable in its entirety.[12]

As a result, the Plaintiff is entitled to judgment in its favor as a matter of law.[13] It is uncontroverted that the Plaintiff's claim was not scheduled or listed by the Defendant, and that it did not have notice or actual knowledge of the Defendant's bankruptcy filing in time for it to timely file a proof of claim. Because it lost the right to participate in the estate in the status of a creditor that had done so, the

---

**10.** The creditor certainly could do so, if it wished. (One sees such motions once in a great while, almost always in a case with a substantial or solvent estate.) But that would be entirely the creditor's own election, and at its own cost.

**11.** The Debtor had not filed a protective proof of claim on behalf of the Plaintiff, which she could have done even after the court-noticed deadline. 11 U.S.C. § 501(c) and Fed. R. Bankr.P. 3004. Absent that, there would have been no basis to even reach the issue under § 726(a)(2)(C) on motion by her—there would have been no allowed-but-subordinated claim in favor of the Plaintiff to advance in priority. *See* 11 U.S.C. § 502(a) ("a claim, ... proof of which is filed ... is deemed allowed...."); Fed. R. Bankr.P. 3002(a) ("[a]n unsecured creditor ... must file a

proof of claim ... for the claim ... to be allowed....").

**12.** In oral argument, the Defendant's counsel made a last, unbriefed, and alternate pitch: if a debt were to be found nondischargeable, it should be limited to the amount of the pro rata distribution that the Plaintiff lost. As held in *Jongquist,* there is no basis in the text of § 523(a)(3)(A) to do that.

**13.** The Defendant pleaded a counterclaim against the Plaintiff. In oral argument, her attorney acknowledged that the counterclaim only articulated her defense premised on § 726(a)(2)(C). He conceded that the counterclaim "should be dismissed" as long as the theory was still entertained on its merits. His remarks are construed as a withdrawal of the counterclaim, so it need not be formally treated in the dispositive terms of this decision.

Defendant's debt to it is excepted from discharge.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiff's motion for summary judgment is granted.

2. Defendant's debt to Plaintiff, as fixed and liquidated via a judgment entered on June 22, 2010 in the Minnesota State District Court for the Tenth Judicial District, Washington County, Minnesota, Court File No. 82–CV–10–724, was excepted from the discharge granted to the Defendant in BKY 09–38291, by operation of § 523(a)(3)(A).