**In re Juan R. DE JESUS, Debtor.**

**Juan R. De Jesus, Plaintiff,**

**v.**

**United States of America and Jasmine Z. Keller, Chapter 13 Trustee, Defendant.**

**Bankruptcy No. 94–32597.
Adversary No. 99–3342.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Sept. 28, 2001.

Kenneth E. Keate, St. Paul, MN, for debtor.

Katja M. Eichinger, Trial Attorney, Tax Division, U.S. Department of Justice, Tulsa, OK, for defendant.

Eric J. Sherburne, Minneapolis, MN, for Chapter 13 Trustee.

## ORDER GRANTING MOTION OF DEFENDANT UNITED STATES OF AMERICA FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on before the Court for hearing on the motion of the United States of America, as Defendant, for summary judgment. The United States appeared by Katja M. Eichinger, Trial Attorney, Tax Division, U.S. Department of Justice. The Plaintiff ("the Debtor") appeared by his attorney, Kenneth E. Keate. Defendant Jasmine Z. Keller ("the Standing Trustee") appeared by her attorney, Eric J. Sherburne. Upon the record made on the motion, including the arguments of counsel at hearing, the Court makes the following order.

### IDENTITY OF PARTIES AND NATURE OF ADVERSARY PROCEEDING

The Debtor is a petitioner in a case under Chapter 13 that is still pending before this Court. He commenced it by filing a voluntary petition on June 24, 1994. The United States, through the Internal Revenue Service, was scheduled as a creditor in the case. On August 30, 1994, the Court confirmed the Debtor's plan of debt adjustment.

In December, 1999, the Standing Trustee filed a motion to dismiss the Debtor's case. As grounds for dismissal, she stated that the Debtor had failed to pay her an amount sufficient to satisfy all allowed priority claims in full, and that the maximum term of his plan under statute had expired. The hearing on the Standing Trustee's motion convened on December 21, 1999. The Debtor's counsel stated that he intended to commence an adversary proceeding against the United States and the Standing Trustee, to seek an adjudication that his client had satisfied his payment responsibilities and was entitled to a discharge under Chapter 13. The same day, counsel filed the complaint in this matter.

The Debtor requests declaratory relief as to his liability to the United States for individual income taxes for 1989. He seeks a judgment that this claim is to be treated as a general unsecured claim in the administration of his plan; both Defen-

dants had assumed that it was to be treated as a priority claim. The Debtor makes his argument under all three prongs of 11 U.S.C. § 507(a)(8)(A).[1] His positions are as follows:

1. Section 507(a)(8)(A)(i) does not afford priority to the claim of the United States, as the Debtor's individual income tax return for 1989 was last due on April 15, 1990, outside the three-year ambit for the statute's assignment of priority.

2. Section 507(a)(8)(A)(ii) does not afford priority, as it is limited to tax assessments other than those made on returns voluntarily filed by taxpayers. Because the IRS assessed the Debtor's 1989 tax liability on the basis of the return that he voluntarily filed on November 24, 1993, this statute simply is not triggered.

3. Finally, § 507(a)(8)(A)(iii) does not afford priority, as the pre-petition date of the IRS's assessment removed it from the ambit of that statute.

In the alternative, the Debtor maintains that the terms of his confirmed plan bind the United States to treatment as the holder of a general unsecured claim for his 1989 income tax liability.

In its answer, the United States variously admits and denies the fact allegations of the Debtor's complaint. It rejects the Debtor's broader statutory theory, maintaining that § 507(a)(8)(A)(ii) gives priority status to its claim. On the Debtor's plan-based theory, it argues that the language of the plan form mandates priority status because its claim was ultimately allowed with priority via the filing of original and amended proofs of claim in which it asserted that status. The United States seeks a declaratory judgment that its claim holds priority under § 507(a)(8), and a mandate that the Debtor pay the claim in full as a condition of receiving a discharge under Chapter 13.

In her answer, the Standing Trustee denies that a standing trustee under Chapter 13, as such, is subject to the binding effect of plan confirmation under 11 U.S.C. § 1327(a). While she acknowledges that the Debtor has paid her the raw dollar-amount contemplated by his plan, she argues that the plan's text obligates him to pay all allowed priority claims in full. The Standing Trustee requests that the Debtor's complaint be dismissed as to her, in its entirety.

### MOTION AT BAR

The United States now moves for summary judgment on the issue of the discharge ability of the Debtor's tax liabilities for 1989. The governing rule is FED. R. BANKR. P. 7056.[2]

---

1. To be entirely precise, the number within the citation here should be "507(a)(7)(A)"; that would conform to the statutory text on the books as of June 24, 1994, when the Debtor filed for Chapter 13. (Effective October 22, 1994, the Bankruptcy Reform Act of 1994, PUB. L. No. 103–394, 108 Stat. 4106 (1994), added a new priority for claims arising from family support obligations, primed over tax claims, the enabling language for which was codified as new § 507(a)(7).) The current numbering of the statute is used to avoid confusion, in light of the greater probability that this decision will be applied to post–1994 cases. The text of the corollary provisions is identical pre- and post–1994, so this benefit outweighs the technical inaccuracy of the citation.

2. This rule makes FED. R. CIV. P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, FED. R. CIV. P. 56(c) provides that, upon a motion for summary judgment,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material

■ To merit the summary adjudication of a dispute under this rule, the Court must make a threshold determination that there is "no genuine issue as to any ... fact" that is material to the claims or defenses at issue on the motion. *In re Circuit Alliance, Inc.*, 228 B.R. 225, 229–230 (Bankr.D.Minn.1998). To get beyond this threshold, the movant for summary judgment must establish a lack of triable fact issues. Where the movant seeks an affirmative adjudication—like here, where the United States requests a declaratory judgment—it may meet this burden by gleaning the elements of its legal theory, amassing the evidentiary fruits of discovery and investigation, and then "point[ing] out," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), that the evidence meets those elements without making out any affirmative defense. *In re Hauge*, 232 B.R. 141, 144 (Bankr.D.Minn.1999). The movant then must show that the governing law lies in its favor, under the facts thus established. *Guinness Import Co. v. Mark VII Distributors, Inc.*, 153 F.3d 607, 610–611 (8th Cir.1998); *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 618 (8th Cir.1988).

■ If the movant does this, the respondent has several options to avoid entry of summary judgment adverse to it. *In re Hauge*, 232 B.R. at 144–145. Two of them fit to the matter at bar. First, the respondent may challenge the sufficiency—that is, the logical probity—of the movant's evidence to meet one or more of the relevant elements. Alternatively, it can produce admissible, probative evidence of its own, that would support a finding on one or more elements contrary to that propounded by the movant. *E.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir.1993); *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1265 (8th Cir. 1990) (all holding that movant's meeting of initial burden on lack of genuine issue of material fact shifts burden of production of evidence to respondent).

■ The Eighth Circuit has noted many times that summary judgment is a particularly appropriate means of judicial decision-making where the issues in litigation are "primarily legal rather than factual." *E.g., Gordon v. City of Kansas City*, 241 F.3d 997, 1002 (8th Cir.2001); *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 713 (8th Cir.2000), *United States Fidelity and Guaranty Co. v. Housing Auth. of the City of Poplar Bluff*, 114 F.3d 693, 695 (8th Cir.1997); *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–1406 (8th Cir.1990). *See also State, Dept. of Revenue v. United States*, 184 F.3d 725, 728 (8th Cir.1999) (where dispute is presented on stipulated or uncontested facts and presents only questions of law, disposition by summary judgment is appropriate).

■ While not moving for summary judgment as such, the Debtor used the closing section of his responsive memorandum to request a determination that his tax liability for 1989 was dischargeable and had been discharged. The lack of a formal motion would not bar the Court from granting such relief to him, were there no triable fact dispute and were the law to merit that result. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (federal trial courts may grant summary judgment to a party *sua sponte*, where record merits it and no purpose would be served by delaying disposition); *Interco Inc. v. Nat'l Surety Corp.*, 900 F.2d 1264, 1268 (8th Cir.1990); *In re Mid–City Hotel Assoc.*, 114 B.R. 634,

fact and that the moving party is entitled to a judgment as a matter of law.

646 (Bankr.D.Minn.1990) (respondent that did not move for summary judgment in its own right may nonetheless receive it in context of movant's motion, where facts are uncontested and law requires judgment in respondent's favor).

## UNDISPUTED FACTS

The record establishes a number of material facts as undisputed. They are:

1. In 1989, the Debtor received taxable income from wages and additional taxable income from conducting a "consulting" business.

2. The Debtor did not file a personal income tax return for 1989 by April 15, 1990, when it was due.

3. On July 27, 1993, the Debtor filed a voluntary petition for bankruptcy relief under Chapter 7 in this Court. He received a discharge in that case on October 20, 1993.

4. On November 24, 1993, the District Director of the Internal Revenue Service at Minneapolis, Minnesota, received the Debtor's personal income tax return for 1989 on Form 1040.

5. On May 30, 1994, the IRS assessed the Debtor's personal income tax liability for 1989 in the amount of $13,181.00. After crediting against the base liability on his account for withholding and excess FICA withholding, it assessed additional liabilities for interest, and penalties for underpayment of estimated tax, late filing, and late payment.

6. This assessment was part of the total of assessments for individual income tax against taxpayers serviced by the IRS's Kansas City regional center that were outstanding on the rolls of the United States as of May 30, 1994. This total exceeded $2,922,000,000.00.

7. On June 24, 1994, the Debtor filed a voluntary petition for relief under Chapter 13 in this Court.

8. On July 11, 1994, the Debtor filed his plan of debt adjustment, on the prescribed local form. Under it, the Debtor proposed to pay $90.00 per month to the Standing Trustee over a 60–month period, for a total of $5,400.00. Under Term 3 of the plan, governing priority claims, the standard form's language provided:

> The Trustee shall pay all amounts entitled to priority under § 507, including the following. The amounts listed are estimates only. The Trustee shall pay the amounts actually owed.

In Term 3's line-entry for the IRS, the Debtor noted "$ 0" as the amount of the "Estimated Claim," and "$ .00" as the amount of the "Total Payments" in favor of the IRS. At the end of Term 3, the Debtor added the following text:

> *After the petition in this case is filed, the taxpayer will file tax returns due to the Illinois Department of Revenue.* All amounts due as a result of filing these returns for the years 1990 and before are classified as general unsecured claims. NOTE: NOTWITHSTANDING A CREDITOR'S PROOF OF CLAIM FILED BEFORE OR AFTER CONFIRMATION, THE CLASSIFICATION OF TAX DEBTS FOR YEARS 1990 AND BEFORE AS UNSECURED AND THE CLASSIFICATION OF PENALTY AND INTEREST ON PENALTY AS IS STATED HEREIN BINDS THE CREDITOR PURSUANT TO BANKRUPTCY RULE 3013 AND 11 U.S.C. § 1322(b)(1) AND CONFIRMATION OF THE PLAN WILL BE CONSIDERED A DETERMINATION OF THE PROPER CLASSIFICATION OF THE SUM DUE FOR THE RETURNS FOR THE YEARS 1990 AND BEFORE.

After payment of claims in several senior classes,[3] the Debtor proposed to have $1,064.00 paid on account of unsecured claims (of a stated total of $21,344.12).

9. The Court confirmed the plan on August 30, 1994.

10. The IRS filed several proofs of claim in the Debtor's Chapter 13 case. The last such amended proof of claim was assigned No. 7 on the clerk's register. Under it, the IRS asserted a priority claim under former 11 U.S.C. § 507 for the Debtor's personal income tax liability for 1989, in the stated amount of $9,277.37.[4]

11. Until the Debtor commenced the adversary proceeding at bar, neither the Debtor, the Standing Trustee, nor any other party in interest had objected to the IRS's claim as filed.

### DISCUSSION

Via its motion, the United States seeks a judgment that would deny all of the relief the Debtor seeks in his complaint. Were the Debtor to receive what he demands, he would be entitled to a discharge under Chapter 13, and the distribution that the United States would receive from the case would be limited to a *pro rata* share of a very small residuum.[5] If the United States is successful on its motion, however, it would be the holder of a priority claim, and would have to receive the full balance of its allowed claim for 1989 income taxes before the Debtor could receive a discharge.

■ 11 U.S.C. § 507(a)(8)(A) grants priority status to certain income tax claims. In his complaint, the Debtor essayed a preemptive strike using all three prongs of this statute. The United States, however, maintains only one of them for the purposes of this motion, § 507(a)(8)(A)(ii).[6] To meet its burden as movant under Rule 56 and as proponent of affirmative relief under this statute, the United States put the following evidence into the record for this motion:

1. A copy of the Debtor's 1989 Form 1040 return, bearing a receipt-stamp at the office of the District Director of the IRS at Minneapolis, with the date of November 24, 1993, and a processing stamp indicating "Delinquent Original Cleared" with the date of February 9, 1994, and "STAT & REF—KCSC."[7]

3. Specifically, the Standing Trustee's compensation, the fees to the Debtor's attorney, and $1,780.00 to the holders of claims on which a co-debtor was liable.

4. The United States has also asserted a general unsecured claim for the Debtor's income tax liabilities for 1984, 1987, and 1988, in a total of $9,863.78. It acknowledged that these taxes had been assessed on August 10, 1992. Though the Debtor originally sought declaratory relief as to his 1988 tax liability as well, this request was mooted when the United States amended its proof of claim.

5. The Debtor has completed all payments to the Trustee required on him on the face of his plan, and the payout in administration of the estate has reached the level of general unsecured claims. 11 U.S.C. § 1328(a) provides, in pertinent part,

As soon as practicable after completion by the debtor of all payments under the plan, ... the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under [11 U.S.C. §] 502 ...

6. In pertinent part, this statute gives an eighth priority to

... allowed unsecured claims of governmental units, only to the extent that such claims are for—
(A) a tax on ... income ...—
...
(ii) assessed within 240 days ... before the date of the filing of the [bankruptcy] petition ...

7. This latter apparently signifies the IRS's Kansas City Regional Service Center.

2. A computer printout dated February 9, 2000, on the IRS's account for the Debtor for "Tax Period: Dec.1989," with the following line-entry:

| CODE | | DATE | MONEY AMOUNT (IF APPLICABLE) |
|------|------|------|------|
| 150 | RETURN FILED AND TAX ASSESSED | 05-30-1994 | 13,181.00 |

This printout contains 20 other line-entries for various ancillary assessments and "subsequent payments." It is presented under the certification of Joan C. Peterson, Chief, Insolvency Unit of the IRS, that it "is a true copy of the transcripts of account for" the Debtor for several years, including 1989.

3. A photocopy of a computer printout of a "Summary Record of Assessments, Kansas City Service Center," dated May 27, 1994, under a similar certification that it is "a true copy of the original Summary Record of Assessments ... for the assessment date of May 30, 1994."

4. A copy of a printout of a screen from this Court's site on the World Wide Web, presenting the results of a search of its database, showing a "filing date" of "06/24/94" for the Debtor's petition under Chapter 13.

5. Photocopies of the IRS's original and amended proofs of claim in the Debtor's Chapter 13 case.

As the IRS would have it, this evidence conclusively establishes that it assessed the Debtor's 1989 tax liability on May 30, 1994, 25 days before the Debtor filed for relief under Chapter 13. Pointing out that such a timing would bring the assessment well within the 240-day window of § 507(a)(8)(A)(ii), the IRS maintains that it is entitled to judgment as a matter of law, adverse to the Debtor.

The Debtor responds with three different theories—one centering on fact, the other two around law.

## I. Sufficiency of Evidence of Date of Assessment

 The Debtor first argues that the United States has not met its movant's burden of production, in that its proof could not support a finding on the date of assessment. As he notes, under the Internal Revenue Code "[f]ederal taxes are assessed at the precise time an assessment officer of the IRS signs a summary record of assessment." *In re O'Connell,* 246 B.R. 332, 334 (B.A.P. 8th Cir.2000) (citing 26 U.S.C. § 6202 [8] and 26 CFR § 301.-6203-1 [9]). As the Debtor would have it,

8. This statute provides:
 If the mode or time for the assessment of any internal revenue tax (including interest, additional amounts, additions to the tax, and assessable penalties) is not otherwise provided for, the Secretary may establish the same by regulations.
 A more apt citation would have been to 26 U.S.C. § 6203, "Method of Assessment":
 The assessment shall be made by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary. Upon request of the taxpayer, the Secretary shall furnish the taxpayer a copy of the record of the assessment.

9. This regulation provides as follows, for "Method of assessment":
 The district director and the director of the regional service center shall appoint one or more assessment officers. The district director shall also appoint assessment officers in a Service Center servicing his district. The assessment shall be made by an assessment officer signing the summary record of assessment. The summary record, through supporting records, shall provide identification of the taxpayer, the character of the liability assessed, the taxable period, if applicable, and the amount of the assessment. The amount of the assessment shall, in the case of tax shown on a return by the tax-

The document entitled "transcript of account" does not purport to be any supporting record of the summary record of assessment, and indeed could not be that document, since it contains much data besides the data set forth, including references to dates and transactions which occurred both before and after the date of assessment.

The point here is a bit obscure. Granted, the most probative evidence would have been a copy of a document actually entitled "summary record of assessment," under the Debtor's name, with the original holographic signature—if, indeed, such is even assembled in these days where public agencies must do their mass administra-

> payer, be the amount so shown, and in all other cases the amount of the assessment shall be the amount shown on the supporting list or record. The date of the assessment is the date ·the summary record is signed by an assessment officer. If the taxpayer requests a copy of the record of assessment, he shall be furnished a copy of the pertinent parts of the assessment which set forth the name of the taxpayer, the rate of assessment, the character of the liability assessed, the taxable period, if applicable, and the amounts assessed.

10. The Debtors' counsel did not object to the admissibility of the transcript of account for the purposes of this motion. *Cf. In re Northgate Computer Systems, Inc.*, 240 B.R. 328, 342–356 (Bankr.D.Minn.1999). Counsel would have been hard-pressed to do so; the record is under seal, making it self-authenticating under FED. R. EVID. 902(1), and it fell squarely under the hearsay exception of FED. R. EVID. 803(8):

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> . . . .
> (8) **Public records and reports.** *Records, reports, statements, or data compilations,* in any form, of public offices or agencies, setting forth (A) the activities of the office or agency . . .
> (emphasis added).

tion through electronic means. However, the document in the record [10] is certainly sufficient to support an inference that the described administrative act was performed on the date indicated. This proffer shifted a burden of production over to the Debtor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986). As to this isolated but key point, the Debtor utterly failed to meet that burden.[11] The result, as to fact finding, was foreordained.

The Debtor's other point under the heading of this argument is irrelevant.[12] In consequence, the argument fails; for the purposes of this motion, there is no genuine issue of material fact.[13]

11. As his sole evidentiary submission for this motion, the Debtor filed a long and rather tendentious affidavit by his counsel. Its content went to a point of law, and one quite distinct from the performance of the ministerial act in question here. There is nothing in the record that indicates that counsel tried to use discovery requests to ascertain the existence of a separate, individualized record.

12. To quote counsel's brief:

> No explanation is given as to why it took over six months from November 24, 1993, the date the return was received by the IRS, until May 30, 1994, for it to be filed by or with the IRS.

This, really, is no more than carping. The delay might be attributed to any of a number of factors, positive or negative, including work backlog and administrative neglect. However, the *fact* of the delay is irrelevant. The Debtor had no cause to rely on any assumption as when the IRS would assess his 1989 taxes on a return filed three and one-half years late. In a general and a specific sense, the Debtor is scarcely one to complain of delay in the assessment.

13. For the purposes of summary judgment, materiality is measured by whether a given fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## II. NATURE OF "ASSESSMENT" THAT TRIGGERS § 507(a)(8)(ii)

 For his second theory, the Debtor argues that the United States is not entitled to a priority claim because § 507(a)(8)(A)(ii) applies only to an assessment made on the basis of an audit or other procedure in which the taxpayer is not the primary motive force. As the Debtor would have it, because the assessment for his 1989 tax liability was based on his voluntary filing of a tax return, priority status did not attach to the claim despite the assessment's meeting the proximity requirement of the statute.[14] Thus, he argues, the United States is not entitled to judgment as a matter of law, and he is.

The legal exercise here is the process of statutory construction. The Debtor's counsel insists that reading the statute's word "assessment" without differentiating among the processes that led up to the assessment would "produce a result demonstrably at odds with the intentions of [the] drafters" of § 507(a)(8)(A)(ii), *United States v. Ron Pair Ents., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). He then presents 17 pages of brief in an attempt to identify just what those intentions were. He also insists that, as a matter of public policy, the statute must be applied so as to favor taxpayer-debtors who file voluntary returns, no matter how belatedly.

In the first instance, however, this is a job for the Occam's razor of a more recent Supreme Court pronouncement:

> In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 474, 112 S.Ct. 2589, 2593, 120 L.Ed.2d 379 (1992).

How clearly does § 507(a)(8)(A)(ii) speak to the issue, then? On its face, it uses the simple adjectival participle "assessed." When applied in the Bankruptcy Code to a federal tax liability, this word should be interpreted consistently with its meaning under the Internal Revenue Code. *In re Hardie*, 204 B.R. 944, 946 (S.D.Tex.1996). The Internal Revenue Code contains only one set of provisions governing "assessment," at 26 U.S.C. c. 63. 26 U.S.C. §§ 6202–6203 clearly identify "assessment" as the ministerial act of *recording* the IRS's own determination of a taxpayer's liability—setting it forth on the IRS's own books, through means and in a form that is to be prescribed by regulation. This does no more than evidence the result of a prior and separate process,[15] which may be one of several types. *In re O'Connell*, 246 B.R. at 334–335 (recognizing that assessment under 26 U.S.C. §§ 6202–6203 takes place both after filing of voluntary return, and after IRS issues notice of deficiency).

---

**14.** For this argument, the Debtor tacitly concedes the date of the assessment and all of the other facts that the United States asserts.

**15.** The regulations recognize that the IRS's pre-assessment process of evaluation and calculation is distinct from assessment's act of recording:

> The district director is authorized and required to make all inquiries necessary to the determination *and* assessment of all taxes imposed by the Internal Revenue Code of 1954 or any prior internal revenue law. The district director is further authorized and required, and the director of the regional service center is authorized, to make the determinations *and* the assessments of such taxes.

26 CFR § 301.6201–1(a) (emphasis added).

The evidencing, however, is accomplished in only one way. Section 507(a)(8)(A)(ii) unambiguously identifies this single form of marking-up as the event that fixes priority in a bankruptcy case.

> When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional cases.

*Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991). This is not a "rare and exceptional case" to merit looking behind the one word—which is a word freighted with meaning under separate federal law, but only one meaning.

Nor is there any extrinsic evidence that Congress intended something more refined, subtle, or limited than its simple reference connotes, despite the Debtor's counsel's urging. In arguing for a more wide-ranging construction, he exhaustingly describes a conundrum that he initially faces when presented with clients long-delinquent in filing tax returns and facing substantial liability under them.[16] As real as this dilemma may be, there is no indication that Congress ever acknowledged it, or recognized the administrative posture that could create it. There is no unequivocal indication in the legislative history that Congress intended to confront or to prevent counsel's problem.[17] The difficulty, then, is just part of the landscape; squaring off with it is a matter of attorney judgment, and invariably of risk-taking on the part of the client. Judicially jiggering

the application of a statute whose import is as simple as this is not an appropriate exit.

The IRS's posting of the Debtor's 1989 tax liability to its books on May 30, 1994, activated § 507(a)(8)(A)(ii) for the bankruptcy case that the Debtor voluntarily commenced less than a month later. From the perspective of this pre-petition circumstance, then, the United States is entitled to judgment as a matter of law.

## III. EFFECT OF CONFIRMATION OF DEBTOR'S PLAN

Lastly, the Debtor argues that confirmation of his plan bound the United States to a treatment as a general unsecured creditor because:

1. Term 3 provided for an "Estimated Claim" of "$ 0" as a priority claim in favor of the IRS and for total payments of "$ .00" to it.

2. The added text at the end of Term 3 operated to "reclassify" the IRS's claim for 1989 taxes to a general unsecured claim.

 As a general proposition, "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan . . ." 11 U.S.C. § 1327(a). This language accords finality and enforceability to the configuration of rights specified under a confirmed plan. Collateral post-confirmation attacks on the substantive treatments given creditors' claims under a plan are barred. *Cf. Harmon v.*

---

16. It has something to do with the alleged difficulty of working out a non-bankruptcy payment plan with the IRS absent the filing of delinquent returns, arrayed against the risk of having priority under § 507(a)(8)(A)(ii) attach to the resulting claim if the debtor does file the returns, such arrangements are not made, and the debtor later elects to file under Chapter 13.

17. Some of the legislative history for § 507(a) limits its references to assessments to those made as a result of an audit. *See* S. REP. No. 989, 95th Cong., 2d Sess. 70 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. This does not mean that Congress contemplated that situation as the sole trigger for § 507(a)(8)(A)(ii). If it had so intended, it would have added a qualifying clause to the identifying noun.

*United States,* 101 F.3d 574, 579 (8th Cir. 1996) (applying 11 U.S.C. § 1227, Chapter 12's corollary to § 1327, to hold that mortgagee could not assert claim to proceeds of real estate sale closed after debtors had finished payments under plan, where plan provided for release of mortgagee's "claim" after completion of payments to mortgagee); *In re Siemers,* 205 B.R. 583, 586 (Bankr.D.Minn.1997). To divine the post-confirmation effect on a plan on a specific creditor's rights, one must look both to the plan's general provisions and to the "specific section of the plan that relates to the [creditor's] claim." *Harmon v. United States,* 101 F.3d at 584.

Here, though the Debtor cites two different parts of Term 3 of his plan, neither provision operates to reclassify the claim of the United States to a general unsecured claim.

 First: the Debtor submitted his plan on the standard form mandated by Loc. R. Bankr. P. (D.Minn.) 3015–1(a). Term 3 of the form governs priority claims. It includes blanks that are to be filled as appropriate for a debtor's debt structure, to fix the treatment of priority claims of certain named creditors[18] and any others designated as priority. The Debtor argues that because this term expressly named the IRS, and because he provided for an "Estimated Claim" and "Total Payments" of nothing, the confirmation of the plan deprived the IRS of any

right to assert a priority claim. This theory, however, fails to take notice of the prefatory language to Term 3, which clearly preserves the process of formal allowance of claims as the means by which a priority creditor's actual distribution rights are fixed in the last instance. The IRS's right to the status of a priority claim for the Debtors' 1989 tax liability, and the total amount it was entitled to receive, were established by that process.[19] By setting the ground rules, this language unequivocally takes precedence over the numerical recitations in the form's blanks.

Secondly: the end of Term 3, the Debtor's counsel inserted verbiage that apparently was tailor-made to his client's case. A close reading supports dividing it into two segments, by subject matter and logic. Neither of them supports the Debtor's argument either.

The first segment consists of the first two sentences. There can be no question that its effect is limited to a tax claim by the Illinois Department of Revenue; the first sentence establishes the Debtor's duty to file certain returns with that taxing authority, and the second specifies treatment as a general unsecured claim for "[a]ll amounts due as a result of filing *these returns* for the years 1990 and before . . ." (emphasis added). By its own specification, this provision has nothing to do with the IRS's claim.

---

18. Specifically, the debtor's attorney and the federal and Minnesota taxing authorities.

19. The recitations on the IRS's filed proofs of claim were *prima facie* evidence of the validity *and amount* of its claim. Fed. R. Bankr. P. 3001(f); *In re Be–Mac Transport Co., Inc.,* 83 F.3d 1020, 1025 (8th Cir.1996) *In re Brown,* 82 F.3d 801, 805 (8th Cir.1996); *In re Gran,* 964 F.2d 822, 826 (8th Cir.1992); *In re Waterman,* 248 B.R. 567, 571 (B.A.P. 8th Cir.2000); *In re Consumers Realty & Dev. Co., Inc.,* 238 B.R. 418, 422 (B.A.P. 8th Cir.1999). This

included the priority status asserted on the proofs of claim. If the Debtor had a contention with any of the claim's characteristics, he had an evidentiary burden in the first instance—to produce evidence to rebut this deemed *prima facie* showing, in the context of a formal court proceeding in objection to the claim. *In re Gran,* 964 F.2d at 827. *See also In re Brown,* 82 F.3d 801, 805 (8th Cir.1996) (rebutting evidence must be "substantial"); *In re Be–Mac Transport Co., Inc.,* 83 F.3d at 1025 n. 3.

198

■ The second segment consists of the third sentence in the paragraph. By its own terms, it defeats the Debtor's insistence that it was to reach the IRS's claim. In the first place, it purports to have the plan imbue "TAX DEBTS FOR THE YEARS 1990 AND BEFORE," unidentified as to creditor or amount, with a "CLASSIFICATION ... AS UNSECURED." Whether this language is made legally effective by confirmation or not, it makes no reference to the issue before the Court here—*priority status. See In re Gran*, 964 F.2d at 828 (recognizing that for administration of bankruptcy estate, the larger set of unsecured claims—and only unsecured claims—is broken into smaller categories of "priority or nonpriority"). In the second, this provision purports to give binding effect to "THE CLASSIFICATION ... AS IS STATED HEREIN," as applied to given claims, upon confirmation of the plan. The plan, however, lacks any reference identifying any taxing authority by name other than the Illinois Department of Revenue. This provision clearly is designed to strengthen other provisions in the plan, but the gaping omission limits its effect to the two sentences immediately preceding it. Had the Debtor intended to have this sentence sweep in the IRS's claim, the simple requirements of due process required a clear notice *to the IRS.* Because there was no such specific reference, this language cannot change the "classification" of the IRS's allowed claim from that afforded by the opening language of Term 3 under the earlier analysis.[20]

## IV. CONCLUSION

There is no genuine issue of material fact as to the request for relief made in the Plaintiff's complaint. Under the governing law, the Plaintiff is not entitled to that relief, and the Defendant is entitled to judgment.[21]

## ORDER FOR JUDGMENT

IT IS THEREFORE, ADJUDGED, AND DECREED:

1. The Plaintiff's liability to Defendant United States of America for individual income taxes for 1989 is properly treated as a priority claim under 11 U.S.C. § 507(a)(8)(A)(ii) for the administration of the estate in BKY 94–32957.

2. The confirmation of the Plaintiff's plan in BKY 94–32957 did not result in the claim of Defendant United States of America having the status of a general unsecured claim for the administration of the estate in that case.

3. Accordingly, the Plaintiff will not be entitled to a discharge under Chapter 13 in BKY 94–32957 until he has paid Defendant Jasmine Z. Keller a sum sufficient to pay the allowed claim of Defendant United States of America for the Plaintiff's 1989 income taxes, in full.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**20.** The wording here is not to be taken as *dictum* that such a provision would have been effective with the right textual reference.

**21.** With the result under the foregoing analysis, it is not necessary to reach the Standing Trustee's arguments that she is not "bound by" the confirmation of the Debtor's plan.